# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3855

SUSAN SCHAEFER-LAROSE,

*Plaintiff-Appellant*,

*v.*

ELI LILLY & COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 07 cv 1133—**Sarah Evans Barker**, *Judge*.

Nos. 11-1980 & 11-2131

JAMES JIRAK, et al.,

*Plaintiffs-Appellees*,
*Cross-Appellants*,

*v.*

ABBOTT LABORATORIES, INC.,

*Defendant-Appellant*,
*Cross-Appellee*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 cv 3626—**Ruben Castillo**, *Judge*.

ARGUED OCTOBER 18, 2011—DECIDED MAY 8, 2012

Before EASTERBROOK, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. These two cases, which we have consolidated for opinion, involve the application of the outside sales and administrative exemptions of the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. §§ 201-19, to pharmaceutical sales representatives employed by Eli Lilly & Co. ("Lilly") and Abbott Laboratories, Inc. ("Abbott"). The plaintiffs in each case claim that, during their tenure as sales representatives with these pharmaceutical companies, they were misclassified as exempt employees and denied overtime pay, in violation of the statute.[1] The employers contend that both the administrative exemption and the outside sales exemption, 29 U.S.C. § 213(a)(1), remove the sales representatives from the overtime protections of the FLSA. The two district courts in the present cases reached opposite conclusions, each relying on cases decided by other circuits.

Before this court, the Department of Labor ("DOL" or the "Department") has participated as amicus curiae in case number 10-3855 and has asked us to consider its arguments in our disposition of cases 11-1980 and 11-2131 as well. In the Department's view, the plaintiffs are

---

[1] With respect to case number 10-3855, Plaintiff Susan Schaefer-LaRose also alleges violations of corresponding New York state wage law, which provides outside sales and administrative exemptions that are analogous to those contained in the FLSA.

neither administrative employees nor outside sales-persons within the meaning of the statute and the Department's regulations.

After thorough consideration of the positions of the parties, the view of the Department, the opinions of our sister circuits and the facts in the records before us, we conclude that, under the regulations of the Department of Labor, the pharmaceutical sales representatives are classified properly within the administrative exemption to the overtime requirements of the FLSA. Consequently, we do not address the applicability of the outside sales exemption.[2] We therefore affirm the judgment of the district court in favor of Lilly in case number 10-3855 and reverse the judgment in favor of the plaintiff class in cases 11-1980 and 11-2131 and remand with instructions to enter judgment for Abbott.[3]

---

[2] Indeed, this question is currently before the Supreme Court in another case arising out of the pharmaceutical industry. *See Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383 (9th Cir. 2011), *cert. granted*, 132 S. Ct. 760 (Nov. 28, 2011) (No. 11-204).

[3] We therefore do not reach the issues in the plaintiffs' cross-appeal in case numbers 11-1980 and 11-2131 concerning willfulness.

## I

## BACKGROUND

**A. Facts**[4]

The defendants, Lilly and Abbott, are global companies headquartered in Indiana and Illinois, respectively. They research, manufacture, market and sell pharmaceuticals. The plaintiffs are current and former employees.

To market their pharmaceuticals, Lilly and Abbott employ the plaintiffs and others as "sales representatives," although the term carries a unique meaning in the context of the pharmaceutical industry.[5] The primary task of a sales representative is to call upon physicians and to persuade them to prescribe the pharmaceutical products of the representative's employer. Because of the restrictions on pharmaceutical sales under federal law and under medical ethics requirements, the sales representatives actually do not *sell* any pharmaceuticals to physicians, nor do the physicians upon whom they

---

[4] Record citations in cases 11-1980 and 11-2131 are introduced with the designation "Abbott R." and refer to the record as it existed in the district court. Record citations in case 10-3855 are introduced with the designation "Lilly R." and refer to the appellate docket court entries.

[5] The plaintiffs in these two actions hold various titles and earn or earned varying salaries. Ms. Schaefer-LaRose, for instance, was a Senior Sales Representative, earning in excess of $100,000 for almost all of her tenure with Lilly. Other plaintiff representatives earned substantially less.

call actually *buy* any pharmaceuticals. Instead, in this tightly regulated industry, Lilly, Abbott and their fellow pharmaceutical companies sell their pharmaceuticals to wholesalers, retailers and other facilities such as hospitals and nursing homes that are licensed to dispense the pharmaceuticals in accordance with a physician's written prescription to the end-consumer, the patient. In meeting with the physicians, the objective of the representatives is to increase the number of prescriptions that those physicians write for their employer's products.[6] An increase in prescriptions written results in an increase in prescriptions filled by end-users and, consequently, an increase in demand for the drug by the dispensing entities from which end-users actually obtain the drug. Sales representatives constitute a substantial part of the workforce of large-scale pharmaceutical manufacturers; Lilly and Abbott currently employ thousands nationwide.

Representatives spend the majority of their time preparing for, making and documenting sales calls, with the consistent goal of obtaining meaningful access to the physicians and of influencing their preference for the company's products. The calls usually take place in target physicians' offices and may, in some cases, last

---

[6] These encounters are termed "sales calls." Although that label is imprecise for these circumstances, we employ it for ease of reading. We do note that these calls were once referred to as "professional visitation," Lilly R.43-9 at 177 (Schaefer-LaRose dep. 185), but there is no material dispute about the content or purpose of the visits.

less than a minute. Some physicians refuse to receive representatives from the pharmaceutical industry in their offices, and, in those cases, sales representatives have to find other ways to reach their target. They might attend hospital presentations or sponsor their own educational events where they hope to encounter and to engage difficult-to-reach physicians. Each representative also has a discretionary budget, the significance of which is disputed in the records, to use on meal or speaker programs or other events designed to reach a particular target. In addition, the sales representatives are allocated limited amounts of free pharmaceutical product samples for distribution to physician offices. These samples are a tool that the employers provide to aid the representatives in gaining access to prescribers, but the degree of discretion the representatives exercise in the distribution of these samples is a matter of some dispute. *See, e.g.*, Abbott R.150-2 at 11 (Arri dep. 232) ("I know it's definitely my responsibility to manage my samples."); Lilly R.43-9 at 175 (Schaefer-LaRose dep. 175) (acknowledging that the decision as to how many samples to leave "was something that you had to decide when you were in the physician's office based on your assessment of the circumstances").[7]

---

[7] The records also demonstrate that the representatives were encouraged or instructed to provide the majority of the samples to the highest-prescribing physicians to obtain the best return on investment. *See, e.g.*, Lilly R.43-17 at 28 (Schaefer-LaRose dep. 168); Lilly R.43-8 at 96 (Schaefer-LaRose

(continued...)

Prior to visiting a particular physician, a representative develops a pre-call plan. The details of these plans vary widely. During the planning process, a representative may review the physician's prescribing practices, patient population and similar information from data provided by the pharmaceutical company or from notes taken by the representative himself on previous visits. Using this information, a representative evaluates whether prior conversations with the physician have been effective and determines whether any adjustments to his approach are necessary. The representative then identifies a strategy for the call, which generally includes identifying specific questions to use in order to engage the physician in a conversation about the product and selecting appropriate visual aids or literature to pique the physician's interest. *See* Lilly R.43-17 at 37 (Schaefer-LaRose dep. 178) (describing the necessary planning decisions and stating that "every representative underwent [that process] before making a call").

The representatives usually focus on a specific specialty—family practice, psychiatry or orthopaedics, for instance. For a specific time frame, the company would instruct them to approach the physicians in that specialty and in their territory regarding a specific

---

[7] (...continued)
dep. 174) (describing how a sales representative would have to manage an allotment of samples and explaining that "[i]f that means your highest prescribers get the majority of samples, the lowest prescribers get none, that is the way it is").

product or range of products.[8] During a sales call, sales representatives use whatever time a physician is willing to give them to speak about one or more of their employer's drugs, including the drug's benefits, its effectiveness, its appropriateness for a given population and similar information. In communicating these facts, the sales force relies on carefully honed messages that originate with the pharmaceutical companies in order to ensure compliance with relevant regulations and pre-approvals by the federal Food and Drug Administration ("FDA"). Because of these same concerns, all materials regarding products that are made available publicly are created centrally. Although the sales representatives select which of their employer's materials would best be used for a specific call, they have no authority to generate anything original.

The representatives are expected to engage the physicians in conversation whenever possible. Although the parties have suggested that there is a serious dispute about the degree to which the representatives are

---

[8] At any given time, a representative in a specialty field usually was responsible for a limited number of products. *See* Abbott R.150-3 at 13 (Giordano dep. 98) (describing her responsibilities as typically involving two or three products at a given time); Abbott R.150-2 at 45 (Benton dep. 223) (discussing incentive compensation for three of the four primary care products she was responsible for promoting in a given period); Lilly R.43-17 at 28-29 (Schaefer-LaRose dep. 168-69) (stating that she was responsible for four products during the last six months of her employment).

"scripted," it became clear at oral argument that any disagreement is mostly semantic. Core messages must be delivered precisely to ensure compliance with applicable laws and to represent accurately the science of a particular product. Nevertheless, the calls do not follow a predictable course. For example, sales representatives are encouraged to employ sales techniques that tailor the company's core messages most successfully to each physician's schedule, preferences and patient population. Sales representatives must be attentive to the circumstances and responsive to a particular physician's substantive areas of interest or concern.[9] Accord-

---

[9] "Do we need to uncover their needs and understand what they're looking for in their specific practices . . ., absolutely, and that's why we were trained so well to ask specific questions that would evoke a specific response." Abbott R.150-3 at 14 (Giordano dep. 146-47); *see also* Abbott R.150-2 at 57 (Bodie dep. 173) (noting that she tailored her presentations upon learning "what the doctors like to see or what kind of questions they have"); *id.* at 67 (Boyer dep. 114-17) (describing decisions that he would have to make during the course of a call, including how he would change his pre-planned approach to discuss efficacy, for instance, if he learned that the doctor's main concern was, instead, side effects); Lilly R.43-15 at 21 (Schaefer-LaRose dep. 179) (acknowledging that the purpose of a pre-call plan was "to better understand the needs of the individual physician before you went in to talk to that person"); *id.* at 22-23 (Schaefer-LaRose dep. 181-82) (stating that sales representatives were trained to ask open-ended questions because "physicians would open up about their experiences and

(continued...)

ingly, they are required to answer the questions posed by the physicians in a manner consistent with the employer's approved messages. Physicians might even ask about various other products made by the respective employer and, if the representative is competent to answer—that is, if the particular drug is within his expertise—the physician's question could redirect entirely the conversation away from the initial plan. In sum, the nature of the industry requires that the representatives work within tightly controlled central messages; nevertheless, the representatives' ability to be responsive to physicians' needs requires significant discretion in the manner and mode of the delivery of that message and in the details emphasized. These elements, crucial to the success of the particular call, are also unique to each call. *See, e.g.*, Abbott R.150-2 at 84 (Brown dep. 105) ("[E]very office is different, every provider is different, every scenario is different, so as much as we were taught cookie cutter, this is how you're supposed to do it, you had to modify it based on whoever it was you were in front of . . . .").[10]

---

[9] (...continued)

their expectations and their needs," and explaining that such answers would help the sales representatives "gain more information about their practice and their patients, and the placing of [the Lilly] product in the practice").

[10] Ms. Schaefer-LaRose noted that Lilly had specific rules as to what constituted a call and that, if she only had a limited amount of time with a particular physician, she would be sure

(continued...)

At the conclusion of individual calls, sales representatives attempt to secure business for their employers from the physician. The records disclose that, once a representative is satisfied with the content of a particular call, he "earn[s] the right to close th[e] sale" by asking the physician to commit verbally—although in a completely non-binding way—to prescribe the company's products where appropriate.[11] Abbott R.150-6 at

---

[10] (...continued)
to provide "the name of the product, the dosage, the frequency and the indication" in order to receive credit for the call. *See* Lilly R.43-9 at 159-60 (Schaefer-LaRose dep. 130-31). However, she explained that, depending on the circumstances surrounding the call, she would focus her message on different factors, taking into consideration the physician's availability and mood, the product she was promoting, and how much time she had to make her pitch. *See id.* at 160-61 (Schaefer-LaRose dep. at 131-32).

[11] Ms. Schaefer-LaRose described how she was "trained to ask for the business during every call." Lilly R.43-15 at 19 (Schaefer-LaRose dep. 177). This meant "ask[ing] the physician to commit to prescribe the product in the appropriate circumstance[s]," or "asking the physician to try . . . the product with a patient who met the description of the patient that [she] had been told to set up on the first page of the detail piece." *Id.* Lilly trained its representatives to try to get a "chip" during each call, which Ms. Schaefer-LaRose described as a positive piece of information from the physician about Lilly's product. *Id.* at 23-24 (Schaefer-LaRose dep. 182-83). The representatives were taught to then use

(continued...)

25 (Rogers dep. 65). Although some representatives apparently do not ask for the commitment, or prefer to ask with somewhat of a softer touch, the companies instruct the representatives to ask for the physician's commitment with every visit.

Sales representatives attempt to develop continuing relationships with the physicians to whom they are assigned and to create an ongoing, positive impression of themselves, their products and their employer.[12] In their

---

[11] (...continued)

that piece of information in order to obtain a commitment from the physician to prescribe Lilly's pharmaceuticals.

[12] *See, e.g.*, Lilly R.43-8 at 108-09 (Schaefer-LaRose dep. 248-49) (explaining that the representatives served as "the primary contact between those physicians and Lilly"); Abbott R.150-3 at 28 (Jirak dep. 91) (noting that he "tried to develop business relationships with the doctors in order to get time with them" and that he would take care to ensure that his actions would not lead them to "have a negative opinion of people that work for Abbott"); Abbott R.150-2 at 85 (Brown dep. 108) ("[Y]ou had to understand where you were going, who you were dealing with and have enough business acumen to be able to present yourself, your company, your products in a way that would make you hopefully memorable in a positive fashion."); Abbott R.150-3 at 16 (Giordano dep. 180) (noting that, in looking at call histories, she would "identify where a doctor was in the selling cycle and then gear [her] presentation . . . based on where they were in that continuum of buy-in"); Abbott R.150-2 at 51 (Bodie dep. 60) (describing how she would review prior notes and focus her attention on the physi-

(continued...)

depositions, the representatives spoke about how "over time" they learned a particular physician's preferences including the methods and types of information to which he responded in a positive manner.[13]

Sales representatives generally structure their days independently and work alone. There is some dispute in the records about the degree of control exercised by the employers over the identity of the physicians visited and the frequency of those visits. It is clear, however, that there is, at minimum, significant direction about the number of visits that should be conducted over a quarter. The employer identifies the physicians as high-prescribing or low-prescribing with respect to the employer's products and assigns a numerical or frequency

---

[12] (...continued)

cian's prior concerns to "reinforce what we talked about or answer any questions that he had given me the last time"); Abbott R.146-4 at 8-9 (Guerrera dep. 85-86) (referencing "building a relationship" with a call-plan physician as a goal); Lilly R.43-15 at 21 (Schaefer-LaRose dep. 179) (explaining that a representative would use a post-call plan "to set up the next call based upon what you learned in the current call").

[13] *E.g.*, Abbott R.150-3 at 5 (Cheryl Fuller dep. 46); *accord* Abbott R.150-2 at 87 (Brown dep. 125) (describing a "sales call continuum," of which the prior work of other team members was a part). At any given time, representatives might be assigned between 30 and 200 or more physicians to call on, with varying frequencies. *See, e.g.*, Abbott R.150-2 at 5 (Arri dep. 106); Abbott R.146-10 at 7 (Chao dep. 96); Lilly R.43-17 at 6 (Schaefer-LaRose dep. 70).

goal regarding visits to that physician by an individual representative or by the team in a certain region. Using this data, the representatives compose a work plan and secure the approval of management. *See, e.g.*, Lilly R.43-17 at 4-5 (Schaefer-LaRose dep. 67-68). The representatives apparently retain some degree of flexibility to respond to conditions in the field, that is, to increase or decrease visits or reach out to additional physicians or others in their offices based on their strategic perceptions.[14] At

---

[14] *See* Abbott R.146-2 at 18-19 (Rancourt dep. 80-81) (describing the call plan and modification process as well as the importance of a representative's judgment in setting a schedule); Abbott R.150-6 at 99 (Paul Fuller decl. 2) (stating that he spends fifty percent of his time visiting non-physician medical office staff and that, because Abbott provides no direction regarding the frequency of such visits, he "us[es] [his] personal knowledge of the territory" to set that schedule); Abbott R.150-7 at 31 (Miller decl. 2) (stating that he "receive[s] a call plan from Abbott" identifying "the suggested frequency" of visits to individual physicians, but that it "is not always an accurate reflection of [his] territory" and he "must use [his] own knowledge and experience" to modify the plan, add or drop physicians, etc.); *id.* at 26 (Hettenback decl. 3) (noting that he is authorized to modify the plan both before and after finalization, and that, after finalization, he "diverge[s] from the call plan about 10-15% of the time"); Abbott R.150-6 at 102 (Paul Fuller decl. 5) ("I can (and do) deviate from [the call plan] if I feel my sales efforts would be better concentrated elsewhere. Basically, I do what I think is right for the business."); Abbott R.146-10 at 8-9 (Chao dep. 97, 100) (describing a sales

(continued...)

Abbott, for instance, representatives set a plan for each quarter and are required to complete seventy-five percent of the listed tasks. Abbott R.163-3 at 110 (Putnam dep. 70); *id.* at 224 (Rancourt dep. 91). At Lilly, representatives develop specific routing plans, which "ha[ve] to absolutely be followed to meet the frequency requirements." Lilly R.43-17 at 10 (Schaefer-LaRose dep. 76); *id.* at 12-14 (Schaefer-LaRose dep. 94-96) (discussing routing plans); *see also* Lilly R.43-8 at 106 (Schaefer-LaRose dep. 228) (noting that she was expected to make nine calls a day).

Representatives in a given territory, however, do work collaboratively in a number of ways. They meet to develop territory-wide plans (also subject to management approval), coordinate physician messages, share information, and determine an effective, non-repetitive

---

[14] (...continued)
representative's own authority to see "extra doctors," although stating that he could not "subtract" physicians from the list); Lilly R.43-9 at 170 (Schaefer-LaRose dep. 152) (acknowledging that, at Lilly, if a particular sales representative was performing poorly, "[y]ou would change your behaviors immediately," to include "try[ing] to up your [call] frequency"). *But see* Abbott R.146-8 at 5-6 (Hurley dep. 105-06) (stating that she could be penalized for responding to a request for samples from a non-call-plan physician without approval from her manager first); Abbott R.146-4 at 8 (Guerrera dep. 85) (stating that she could meet with plan doctors only and could not "meet a [non-plan] nephrologist at, you know, at the mall and add them to [her] call plan").

visit schedule with physicians.[15] In fact, beginning in 1998, Lilly established "coordinat[ion of] efforts with territory partners in a team environment" as one of the overall objectives for its representatives. *See* Lilly R.43-9 at 201-02 (Schaefer-LaRose dep. 256-57). In keeping with this objective, sales representatives often work with a partner. Partners within a territory confer regarding the development of routing plans, as well as how to allocate funds for peer-to-peer programs. In addition,

---

[15] *E.g.,* Abbott R.150-3 at 7 (Cheryl Fuller dep. 82-85); *see also* Abbott R.150-2 at 51 (Bodie dep. 59-60) (discussing the physician-specific notes that could be accessed by different representatives to coordinate visits and messages); *id.* at 70 (Boyer dep. 154-57) (discussing a team-designed method of information-sharing); *id.* at 84 (Brown dep. 105) (stating that representatives "would be on the phone [with each other] all day talking about doctors"); Abbott R.150-3 at 13 (Giordano dep. 99) (stating that it would be "redundant" to review other representatives' old call notes because they "were also communicating with each other like daily, every other day, talking about what was taking place"); *id.* at 15 (Giordano dep. 172-73) (discussing the "business plan" for the team or "pod" and the method by which it was constructed); Lilly R.43-8 at 66 (Schaefer-LaRose dep. 49) (stating that representatives "were in near constant telephone contact" and "often spoke on the telephone during the evening hours to help and support each other"); Lilly R.43-9 at 176 (Schaefer-LaRose dep. 180) (explaining that post-call plans could be used to inform partners about "something very important that happened" or "[s]ome huge piece of information that needed to be followed up on").

representatives who run out of samples are able to call their partners to see if they have any additional samples to distribute. Representatives who are short on discretionary funds to host an educational event might suggest a partnership, such that some portion of the food or facilities costs came from another representative's allocation.

Except for occasional ride-alongs by a supervisor, the sales representatives are without direct supervision while doing their most significant task—meeting with physicians. However, sales representatives do have regular contact with supervisors through periodic check-ins and in regular conference calls, meetings and training sessions.

Sales representatives receive extensive training, both substantive and skills-based. They are trained and tested on diseases, product details and products manufactured by their competitors. *See* Abbott R.150-3 at 23 (Jirak dep. 53) (describing roughly three months of near-continuous training at Abbott's headquarters as "extremely thorough, very long"); Lilly R.43-9 at 156, 166-67 (Schaefer-LaRose dep. 123, 140-41) (describing the initial classroom instruction and periodic follow-up training sessions); *id*. at 161-64 (Schaefer-LaRose dep. 132-35) (describing the process for learning disease states).[16] They

---

[16] Indeed, Ms. Schaefer-LaRose described herself as a "scientist," rather than a salesperson, because she was charged with "convey[ing] scientific information to physicians about how

(continued...)

also receive significant "sales" training that teaches, through role-play and various other tools, techniques for persuading physicians and for "closing" the sale.

Sales representatives historically have been classified throughout the pharmaceutical industry as exempt employees under the FLSA and related state statutes. At both Lilly and Abbott, the representatives work for a base salary plus incentive pay; the latter is based on total sales in the representative's territory. Although the incentive pay provides a monetary reward for the representatives, they do not receive direct "commissions" based on physician commitments made to them or on prescriptions simply written by the physicians; the companies make incentive decisions based on prescriptions *actually filled and purchased*. Prescriptions written but never filled do not influence the incentive decision.

## B.  Procedural Histories

### 1.  No. 10-3855

Susan Schaefer-LaRose originally filed this action on November 14, 2006, in the Northern District of New York. Lilly moved to transfer the case to the Southern District of Indiana under 28 U.S.C. § 1404(a), and, after transfer was granted, moved for summary judgment. The district court granted Lilly's motion for summary judg-

---

[16] (...continued)
and why [Lilly's] product is beneficial to patients." Lilly R.43-9 at 177 (Schaefer-LaRose dep. 185).

ment; it concluded that the position of pharmaceutical sales representative was within both the outside sales exemption and the administrative exemption to the FLSA.

Beginning with the outside sales exemption, the district court took a pragmatic approach, emphasizing the structure and realities of the pharmaceutical industry. Specifically, the court acknowledged that "[o]nly the nature of the heavily regulated pharmaceutical industry prevented Ms. Schaefer-LaRose from going beyond receiving non-binding commitments from the physicians on whom she made calls in her *sales territory to consummating final sales to them*." *Schaefer-LaRose v. Eli Lilly & Co.*, 663 F. Supp. 2d 674, 686 (S.D. Ind. 2009) (emphasis added). The court pointed to the "undisputed fact" that "Ms. Schaefer-LaRose was clearly hired as a Lilly sales representative, not simply to educate and inform physicians about Lilly pharmaceuticals, but to generate sales of those products." *Id.*

The district court rejected Ms. Schaefer-LaRose's argument that her work was not within the outside sales exemption because she actually did not consummate sales, but rather engaged in promotion work which resulted in sales made by a third party. The court distinguished Ms. Schaefer-LaRose's work from traditional promotion work, explaining that she "did not merely 'grease the skids' in preparing the way for a second wave of Lilly employees who later would visit those same physicians and close the actual sales." *Id.* at 687. Rather, "when her efforts succeeded later on in terms of the issuance of a prescription by a physician to a patient

who purchases the medication, Ms. Schaefer[-]LaRose personally received salary benefits for those prescriptions as part of her compensation package." *Id.*

Taking note of the indicia-of-sales factors in the regulations, the court concluded that all of Ms. Schaefer-LaRose's ancillary duties, which included preparing and reviewing reports, distributing drug samples to physicians, and allocating funds for programs, were in direct support of her sales efforts to secure commitments from physicians to prescribe Lilly pharmaceuticals. Additionally, the court noted that Ms. Schaefer-LaRose was compensated, in large part, based upon the number of prescriptions written within her territory. The court therefore concluded that sales representatives indeed make "sale[s]" within the meaning of section 3(k) of the FLSA, 29 U.S.C. § 203(k).

The court then turned to whether, as a pharmaceutical sales representative, Ms. Schaefer-LaRose qualified as an exempt administrative employee. After setting forth the three-pronged test of the regulation, the court focused on the second prong: whether the employee engages in office or non-manual work directly related to management or general business operations. Once again adopting a pragmatic approach, the court concluded that Ms. Schaefer-LaRose's marketing and promotion work was clearly distinct from the company's production of pharmaceuticals, and, as such, satisfied the requirement raised by the production/administration distinction described in 29 C.F.R. § 541.201(a). The court then rejected Ms. Schaefer-LaRose's argument that,

because her work was focused on a limited group of doctors, it was not directly related to the management or general business operations of the company. The court pointed out that "[t]he success of Lilly's business depends in significant part on whether consumers purchase pharmaceuticals produced by Lilly," and therefore the success of its sales representatives is critical to Lilly's business. *Schaefer-LaRose*, 663 F. Supp. 2d at 690. The court therefore concluded that, due to the nature of the business, "the activities of each individual sales representative have a substantial impact on Lilly's business operations and bottom line." *Id.* at 691.

Having determined that Ms. Schaefer-LaRose satisfied the second prong of the administrative employee test, the court turned to the third prong of that exemption: whether the employee exercises discretion and independent judgment with respect to matters of significance. The court rejected Ms. Schaefer-LaRose's characterization of the record as "demonstrat[ing] that she had very little latitude in her job, that she was rigorously trained, closely monitored and supervised, and was subject to strict oversight and control in the performance of her duties." *Id.* at 691-92 (internal quotation marks omitted). In reaching its conclusion that Ms. Schaefer-LaRose "exercised considerable discretion and independent judgment as part of her daily work for Lilly," the court noted that Ms. Schaefer-LaRose tailored each presentation to the specific physician, analyzed reports to evaluate her success, decided which drugs and how many to leave with each physician, and determined the most effective allocation of the meals budget. *Id.* at 693-

94. Finally, the court explained that this exercise of discretion clearly was aimed at increasing the number of Lilly prescriptions written in her territory—"a matter of considerable significance to Lilly to say the least." *Id.* at 694. Accordingly, the district court granted Lilly's motion for summary judgment.

Ms. Schaefer-LaRose sought reconsideration, which was denied on September 30, 2010. A final judgment was entered on November 12, 2010, under Federal Rule of Civil Procedure 54(b).[17]

### 2. Nos. 11-1980 & 11-2131

James Jirak and Robert Pedersen brought this action in the Northern District of Illinois, and the district court conditionally certified a class. After 297 plaintiffs opted in, the district court ruled that only 78 plaintiffs had claims within the three-year limitations period.

Abbott filed a motion for summary judgment against named plaintiffs Mr. Pedersen and Mr. Jirak, noting the absence of a final class certification order. The plaintiffs cross-moved for summary judgment. The district court granted the motion on liability for the plain-

---

[17] In addition to Ms. Schaefer-LaRose, there are approximately 388 opt-in plaintiffs, as part of a conditionally certified collective action, all of whom share the same FLSA claims. The claims of the opt-in plaintiffs remain pending before the district court as the case has been stayed by the district court's November 12, 2010 order, pending this appeal.

tiffs. *Jirak v. Abbott Labs., Inc.*, 716 F. Supp. 2d 740 (N.D. Ill. 2010).

In analyzing the problem before it, the district court relied heavily on an amicus brief filed by the DOL before the Second Circuit in *In re Novartis Wage & Hour Litigation*, 611 F.3d 141 (2d Cir. 2010). In that brief, the Secretary of Labor argued that pharmaceutical sales representatives do not make "sale[s]" within the meaning of section 3(k) of the FLSA, 29 U.S.C. § 203(k). The Secretary noted that, although the work of the representatives bears some indicia of sales, the representatives neither sell nor take orders. Instead, "'they provide information to target physicians about [the company's] drugs with the goal of persuading the physicians to prescribe those drugs to their patients.'" *Jirak*, 716 F. Supp. 2d at 745 (quoting the Secretary's *Novartis* amicus brief). Because the most that the representatives achieve from a given "sales" call is "'a non-binding commitment to prescribe . . . when appropriate,' they 'do not meet the regulation's plain and unmistakable requirement that their primary duty must be "'making sales."'" *Id.* (quoting the Secretary's *Novartis* amicus brief). The Secretary viewed the representatives in *Novartis* as engaged in non-exempt promotional work, designed to stimulate sales generally or sales that would be consummated by others.

Accepting the plaintiffs' argument that the Secretary's view was owed deference under *Auer v. Robbins*, 519 U.S. 452 (1997), the court found the Secretary's position "both persuasive and consistent" with its own view of

the regulation and agreed that the "sales" work done by the representatives was described more accurately as "promotion[]" work. *Jirak*, 716 F. Supp. 2d at 747. The court explicitly noted its disagreement with the decision of the district court in *Schaefer-LaRose*, 663 F. Supp. 2d 674. It rejected the view that the work of the sales representatives "represented a special category with regard to 'making sales,'" and further noted that courts must construe narrowly the exemptions to include those "plainly and unmistakably" within the statutory and regulatory framework. *Jirak*, 716 F. Supp. 2d at 748 (quotation marks omitted).

The district court then turned to the administrative exemption. It noted each of the regulatory requirements for the exemption, and then turned first to the third prong: whether the employees exercise discretion with respect to matters of significance. The court found that the employees principally applied sales skills to Abbott's established techniques and procedures rather than exercising discretion. Although noting that they had flexibility to determine how to deliver Abbott's message, they "were not 'free from immediate direction.'"[18] *Id.* at 750 (quoting 29 C.F.R. § 541.202(c)). Again, the district court turned to the DOL's *Novartis* brief, which stated that the discretion exercised by the representatives in that case was insufficient to warrant the administrative exemption. Although not explicitly stating that it was deferring to the agency, the court

---

[18] The court provided no record citation for this fact.

found its analysis "consistent with previous agency decisions." *Id.* at 751. Accordingly, the court entered summary judgment on liability for the plaintiffs.

Prior to the damages trial, Abbott filed a "Motion for Judgment as to Willfulness," contending that any FLSA classification error had not been shown to be willful. Abbott R.208. The district court agreed. It found that Abbott's interpretation of the FLSA was reasonable and that no evidence demonstrated that Abbott intentionally had misclassified the employees to avoid overtime liability. Because the statute of limitations for non-willful violations of the FLSA is two, not three years, *see* 29 U.S.C. § 255(a), the court's order reduced the number of eligible plaintiffs by nineteen. The parties stipulated to damages in the amount of $3.5 million, and judgment was entered for the remaining fifty-seven eligible plaintiffs.

## II

### ANALYSIS

#### A. Standard of Review

We review a district court's entry of summary judgment de novo, taking the facts and all reasonable inferences in favor of the nonmoving party.[19] *Musch v. Domtar Indus.,*

---

[19] The district court had jurisdiction over the FLSA claims under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. It had jurisdiction over the state law claims under 28 U.S.C. § 1367(a). We have jurisdiction under 28 U.S.C. § 1291.

(continued...)

*Inc.*, 587 F.3d 857, 859 (7th Cir. 2009). The burden is on the employer to establish that an employee is covered by the exemption. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). As a remedial statute, the exemptions are narrowly drawn against the employers, *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 660 (7th Cir. 2011), and "limited to those establishments plainly and unmistakably within their terms and spirit," *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). This approach ensures that we remain faithful to the plain wording of the statutory language as a whole and, consequently, to the intent of Congress. *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007).

## B. The FLSA and Accompanying Department of Labor Regulations

Under the FLSA, employees are entitled to overtime pay (i.e., one and one-half times the regular rate) for any hours worked in excess of forty hours per week,

---

[19] (...continued)

As we have noted, these cases were resolved by the district courts in different ways, with one court ruling for the plaintiff class and against Abbott, and one court ruling against Ms. Schaefer-LaRose and for Lilly. We are obligated to view the facts of each case in the light most favorable to the party challenging summary judgment in each. We have no significant difficulty in applying that rule here because we conclude that the factual disputes in these records are insignificant and, therefore, are not material to the outcome of either case.

unless they come within one of the various exemptions set forth in the Act. 29 U.S.C. §§ 207, 213. Under the statute's express delegation of rule-making authority, the Secretary has issued, after notice-and-comment procedures, detailed regulations that define each of the exemptions in § 213(a)(1). *See* 29 U.S.C. § 213(a)(1) (providing authority); Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,124 (Apr. 23, 2004) (acknowledging that the regulations were issued pursuant to statutory authority); *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165-68 (2007) (explaining the statutory and regulatory scheme); *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1069 (7th Cir. 1997) (discussing the regulations as having "the force and effect of law" (quotation marks omitted)).

Among those exemptions is one that exempts from the overtime requirement of § 207 "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). With regard to the administrative exemption, the Secretary has promulgated the following regulations:

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
>> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

In applying this regulation,[20] our evaluation of the present FLSA claim, as in all such claims, requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 870 (7th Cir. 2008).

---

[20] The parties address extensively the degree of deference owed to the Secretary's position. Most of this argument addresses the appropriate deference owed to the Secretary's interpretation of an ambiguous regulation. *Cf. Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (declining to defer to an agency's interpretation, contained in an opinion letter, of an unambiguous regulation); *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997) (deferring to an agency's interpretation of its own regulation stated in an amicus brief). Although this question might deserve significant attention if an interpretation of the regulations were in question, as it perhaps is with respect to the outside sales exemption, it does not apply here. In this case, we are simply tasked with the application of an unambiguous regulation to the particular facts.

With respect to the first prong, the parties agree, and the records are clear, that the sales representatives were compensated on a salary basis that qualifies them for the administrative employee exemption. Accordingly, the two "duties" requirements set forth in the second and third prong of the regulation are the focus of this appeal. We now turn to an analysis of each.

### 1. Work "Directly Related" to "Management or General Business Operations"

The second prong of the test for the applicability of the administrative exemption requires that the qualifying employee's "primary duty [must be] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). The regulations provide further guidance with respect to this point:

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. *To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing*

*production line or selling a product in a retail or service establishment.*

(b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

*Id.* § 541.201 (emphasis added).

The plaintiffs submit that, as sales representatives, their day-to-day responsibilities do not include work that would constitute "running or servicing . . . the business"

within the meaning of 29 C.F.R. § 541.201(a).[21] In their view, the work that they perform for Lilly and Abbott, promotional and sales-like work focused on a limited, select group of physicians, does not qualify for the administrative exemption. The plaintiffs elaborate on this argument by contending that the exemption was designed for "higher level employees" whose work is targeted at sales, promotional and marketing policies of the company *overall*. Schaefer-LaRose Br. 47; *accord* Abbott Appellees'/Cross-Appellants' Br. 72. Finally, the plaintiffs argue that cases that have applied the exemption in other courts have involved employees who possessed greater authority with respect to strategic design, proposal writing, supervision or similar significant responsibilities.

We cannot accept the plaintiffs' view. We begin with the language of the regulations. Specifically, the regulations distinguish between the type of work that involves "the running or servicing of the business," and work such as laboring "on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). That is, when an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative. *See Haywood*, 121 F.3d at 1072 (quoting *Martin v. Cooper Electric*

---

[21] The Secretary does not address this issue in her amicus brief. Instead, in considering the administrative exemption, she relies only on the ground that Ms. Schaefer-LaRose did not satisfy the discretion and independent judgment prong.

*Supply Co.*, 940 F.2d 896, 904-05 (3d Cir. 1991), for the proposition that "'[s]ervicing' a business within the meaning of [the former regulation] denotes employment activity ancillary to an employer's principal production activity"). As the district court in *Schaefer-LaRose* noted, the core function of the drug makers here is the development and production of pharmaceutical products. The plaintiffs' work *supports* that function, but is distinct from it.[22]

Furthermore, in the preamble to the current regulations, the Department of Labor reaffirms the view it has

---

[22] In *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991), the Third Circuit applied the "administrative/ productive work dichotomy" under the former regulations to reach the conclusion that sales professionals at a wholesaler could not be classified as administrative employees. The only business of the wholesaler was *sales*. It neither produced its products nor provided services as its principal business activity. Accordingly, those responsible for the sales were engaged in the *only* production relevant to the employer's business.

The Department of Labor since has modified the regulations with the intent "to reduce the emphasis on" the dichotomy described in *Martin*. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,140 (Apr. 23, 2004) (quotation marks omitted). Although the distinction is not determinative unless an employee is engaged unequivocally in production, it remains "one analytical tool that should be used toward answering the ultimate question." *Id.* at 22,141 (internal quotation marks omitted).

held for more than sixty years that "the administrative operations of the business include the work of employees servicing the business, such as, for example, advising the management, planning, negotiating, *representing the company*, purchasing, *promoting sales*, and business research and control." 69 Fed. Reg. at 22,138 (emphasis added) (internal quotation marks omitted); *see also id.* (noting that "exempt administrative work includes not only those who participate in the formulation of management policies or in the operation of the business as a whole, but it also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business" (internal quotation marks omitted)). The current regulations themselves provide an illustrative list of "functional areas" or departments from which employees frequently qualify for the administrative exemption; that list includes such areas as advertising, marketing and public relations. 29 C.F.R. § 541.201(b). Although none is a perfect description of the work of the representatives here, they are sufficiently similar to suggest that the representatives' work is directly related to the general business operations of the pharmaceutical companies.[23]

---

[23] We note in passing the plaintiffs' argument that the Second Circuit's decision in *Reisick v. Universal Communications of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010), requires an opposite

(continued...)

---

[23] (...continued)

result. *Reisick* concludes that an *individual salesperson* who is focused on *individual sales* does not qualify for the exemption. Its reasoning is not applicable to the particular jobs at issue here in this particular industry. *Id.* at 107. In *Reisick*, the court considered the position of someone selling advertising space in a free magazine. The Second Circuit began by noting that the publisher was not operating one of the archetypal businesses envisioned by the FLSA, but that, by analogy to those archetypes, the employee in question was involved in routine individual sales. Specifically, the magazine's advertising space—the only revenue-generator the company had—was its "product," and the employee in question *sold* it. *Id.* at 106 (quotation marks omitted). The court then distinguished the employee's direct sales work with work that would encourage sales more generally. Here, the pharmaceutical company defendants produce actual pharmaceutical products, which the plaintiffs promote to physicians. Indeed, the plaintiffs have gone to great pains to explain that they do not *sell* to any individuals, although they engage in targeted promotion efforts. They emphasize that they are not credited with sales, even when data shows physicians they target begin using a product they promote with greater frequency. They receive bonuses based on consumer sales in their region without any of those sales being attributable to them. Although plaintiffs' efforts are targeted, simply analogizing them to sales is unconvincing. Not only are the circumstances of pharmaceutical work somewhat unusual, as far as sales and marketing go, but the plaintiffs strenuously distinguish their work from "sales" in the context of the outside sales exemption that we have declined to address.

(continued...)

The representatives here are the principal ongoing representatives of the company to the professional community that is in a unique position to make, or deny, a viable market for the company's product. They do not make individual sales of medications, but ensure, on a continuing basis, that the medical community is fully aware of the potential of the company's pharmaceutical products and that the same community is confident that the company's products will be effective tools in the practical setting of a medical practice. Moreover, the representatives are one of the principal, and perhaps the main, conduit by which physicians provide meaningful feedback to the company on the actual effectiveness, and limitations, of the product.

Our cases further support this result. In *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066 (7th Cir. 1997), we considered the claim for overtime by a customer service representative for a moving company. The plaintiff was responsible for settling customer complaints "to ensure quality service" and "to prevent the customer's dissatisfaction with some aspect of his move from escalating into litigation." *Id.* at 1068. In this role, she served as the face of the company to claimants and, sometimes, their attorneys. In concluding that she satisfied the "directly related" prong of the administrative exemption, we noted that her tasks, including

---

[23] (...continued)
In sum, *Reisick* does not provide an apt analogy to the present situation.

serving as the "sole contact" with customers and "represent[ing] the[] employer," were among "the types of classic administrative functions" contemplated by the regulation. *Id.* at 1072. We similarly concluded that her work was clearly of substantial importance to the business, in part because her role was to protect the customer base by keeping customers "happy" and to minimize possible litigation exposure that could result from dissatisfied customers. *Id.*

Similarly, in *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008), we held that work performed by automobile damage appraisers satisfied the "directly related" prong, even when their duties did not include making pivotal determinations of coverage or liability. In *Roe-Midgett*, the employer provided, under contract, claims processing services for liability insurers. The employees in question spent most of their time investigating automobile accidents in the field, interviewing witnesses, physically inspecting damage and estimating repair costs using appropriate software. If the appropriate authorities within the company determined that liability had been established and coverage approved, the employees were empowered to settle lower-end claims consistent with their estimates. In reaching our conclusion that they were part of the employer's general business operations, we noted that the plaintiff damage appraisers operated with minimal oversight in settling more than half of all claims that the employer processed. We found significant that the appraisers were the "'face'" of the employer to third parties, specifically, insurance claimants and mechanics;

furthermore, their "front line[]" tasks were more properly characterized as administrative as opposed to that of a "postindustrial equivalent of production workers." *Id.* at 871-72.

We also find support in a decision from our colleagues in the First Circuit, *Reich v. John Alden Life Insurance Co.*, 126 F.3d 1 (1st Cir. 1997). In *John Alden*, the First Circuit evaluated a claim by marketing representatives who claimed that John Alden had misclassified them as exempt and denied them overtime in violation of the FLSA. The marketing representatives did not sell insurance products to end-consumers; instead, they managed relationships with a list of independent field agents who worked directly with customers seeking insurance. The field agents, who were not employed by John Alden, would rely on the information provided by the marketing representatives in preparing insurance proposals and in recommending insurance products to consumers. Those field agents typically recommended a range of products, including both those offered by John Alden and by its competitors. Each representative maintained his own "deck" of agents, usually 500-600, and was responsible for "continually cull[ing] [his] deck[] to maintain an active agent base." *Id.* at 3-4 (quotation marks omitted). The marketing representatives did not sell insurance products to the agents or to the customers; instead, they encouraged the use of John Alden's products by rigorously maintaining contact with a critical middleman in the chain to the customer. The First Circuit, drawing on the Third Circuit's decision in *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896 (3d

Cir. 1991), held that the marketing representatives were performing administrative work. Specifically, the court concluded that they were engaged in "'activit[ies] *ancillary* to'" the employer's principal function. *John Alden*, 126 F.3d at 10 (emphasis in original); *see also id.* (agreeing with the district court's conclusion that "the day-to-day activities of marketing representatives are more in the nature of 'representing the company' and 'promoting sales' of John Alden products, two examples of exempt administrative work provided by" the regulations then in effect). The court also acknowledged that the representatives played no meaningful role in negotiation. Although they recommended "appropriate combination[s]" of John Alden products, they did not price them or approve ultimate applications for coverage. *Id.* at 4.

The parallels between the present case and *Haywood*, *Roe-Midgett* and *John Alden* convince us that the work done by the pharmaceutical sales representatives properly is characterized as administrative. The representatives before us are the public face of their employer to the most important decision-maker regarding use of their companies' products, the prescribing physicians. The representatives neither produce the employers' products nor generate specific sales, but service the production and sales aspects of the business by communicating the employers' message to physicians. The goal of their work is to increase market share indirectly or, stated differently, to promote sales. To the maximum extent possible, their work is based on maintaining continuous and regular contact with the physicians to whom they are assigned, anticipating their objections and concerns

and addressing them on behalf of their employers. We therefore conclude that the sales representatives' primary duty is the performance of work directly related to the general business operations of the employers, which satisfies the second prong of the administrative exemption.

### 2.  Primary Duty Includes the Exercise of Discretion and Independent Judgment

The third prong of the administrative exemption requires that the employee's "primary duty include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Again, the regulations provide substantial further detail:

> (a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to

consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

(c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immedi-

ate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

(d) An employer's volume of business may make it necessary to employ a number of employees to perform the same or similar work. The fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does

not involve the exercise of discretion and independent judgment with respect to matters of significance.

(e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly. For example, a messenger who is entrusted with carrying large sums of money does not exercise discretion and independent judgment with respect to matters of significance even though serious consequences may flow from the employee's neglect. Similarly, an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer.

*Id.* § 541.202 (internal citation omitted).

The plaintiffs contend that their work fails to meet the standard set forth in the regulation. The Department of Labor supports the position of the plaintiffs, relying principally on its own prior opinion letters in other contexts, as well as the Second Circuit's decision in *Novartis*, 611 F.3d 141. By contrast, the pharmaceutical companies assert that the representatives had a host of core duties committed to their discretion, including determining how best to gain access to particular physicians and managing their limited discretionary budgets. Their primary argument, however, focuses on the discretion that an individual representative must employ in the course of an individual sales call with a physician to communicate effectively his employer's core message to the specific audience and to address a physician's particular concerns.

The application of the discretion and independent judgment prong in the pharmaceutical sales context is a question of first impression in this circuit. Several of our sister circuits have considered similar cases, however, and, we begin our consideration of this facet of the case by examining their holdings. We focus on two decisions that place the issue before us in stark relief.

The first is the case upon which the plaintiffs, supported by the Secretary, rest a substantial part of their argument, the Second Circuit's decision in *Novartis*, 611 F.3d 141. The employer in *Novartis* raised almost identical arguments concerning the discretion exercised by its representatives to those that Abbott and Lilly raise here. The Second Circuit rejected those arguments,

largely by "[c]omparing the record as to the Reps'
primary duties against the illustrative factors set out in
§ 541.202(b)." 611 F.3d at 156. The court concluded that
the record before it showed no genuine issue of fact on
some specific factors in the regulation, including the
authority to commit the employer on matters having
significant financial impact or to formulate management
policies or practices. The court further concluded that
other activities evinced not discretion but simply the
application of skill. Not only is the application of skill
to established practices insufficient to demonstrate discre-
tion, *see* 29 C.F.R. § 541.202(e), the Second Circuit deter-
mined that the "skills are exercised within severe limits
imposed by" the employer. *Novartis*, 611 F.3d at 157.
Finally, the court concluded that those matters truly
within the discretion of the representatives, such as
setting daily schedules, allocating budgets for promo-
tional events and allocating samples, were too signif-
icant to warrant application of the exemption.

By contrast, in *Smith v. Johnson & Johnson*, 593 F.3d
280 (3d Cir. 2010), the Third Circuit reached an
opposite result. The court took note of the plaintiff's
own characterization of her independence in performing
her job responsibilities. Specifically, the *Smith* plaintiff
stated that she was allowed "to run the territory the way
[she] wanted to," *id.* at 283 (quotation marks omitted),
which the court characterized as an admission that she
was "the manager of her own business," *id.* at 285.
Notably, however, although the Third Circuit carefully
limited its holding to "the specific facts developed in
discovery" in the case before it, *id.* at 283 n.1, the job

responsibilities to which the plaintiff referred closely
mirrored those described for the *Novartis* representa-
tives. As the Third Circuit described those duties:

> In essence, Smith's position required her to travel
> to various doctors' offices and hospitals where
> she extolled the benefit of J & J's pharmaceutical
> drug Concerta to the prescribing doctors. J & J
> hoped that the doctors, having learned about
> the benefits of Concerta, would choose to
> prescribe this drug for their patients. Smith, how-
> ever, did not sell Concerta (a controlled substance)
> directly to the doctors, as such sales are prohibited
> by law.
>
> J & J gave Smith a list of target doctors that it
> created and told her to complete an average of
> ten visits per day, visiting every doctor on her
> target list at least once each quarter. To schedule
> visits with reluctant doctors, Smith had to be
> inventive and cultivate relationships with the
> doctor's staff, an endeavor in which she found
> that coffee and donuts were useful tools. J & J left
> the itinerary and order of Smith's visits to the
> target doctors to her discretion. The J & J target list
> identified "high-priority" doctors that issued a
> large number of prescriptions for Concerta or a
> competing product, and Smith could choose to
> visit high-priority doctors more than once each
> quarter. J & J gave her a budget for these visits
> and she could use the money in the budget to
> take the doctors to lunch or to sponsor seminars.

At the meetings, Smith worked off of a prepared "message" that J & J provided her, although she had some discretion when deciding how to approach the conversation. J & J gave her pre-approved visual aids and did not permit her to use other aids. J & J trained its representatives to gauge a doctor's interest and knowledge about the product, eventually building to a "commitment" to prescribe the drug.

In Smith's deposition she made it clear that she appreciated the freedom and responsibility that her position provided. Though a supervisor accompanied Smith during the doctor visits on a few days each quarter, by her own calculation Smith was unsupervised 95% of the time. As Smith explained during her deposition, "[i]t was really up to me to run the territory the way I wanted to. And it was not a micromanaged type of job. I had pretty much the ability to work it the way I wanted to work it." According to Smith's job description, she was required to plan and prioritize her responsibilities in a manner that maximized business results. J & J witnesses testified (and J & J documents confirmed) that Smith was the "expert" on her own territory and was supposed to develop a strategic plan to achieve higher sales.

Before her visits, Smith completed pre-visit reports to help her select the correct strategy for that day's visits. At the end of her day, Smith

completed post-visit reports summarizing the events of the visits. Smith would refer back to this information before her next visit to the same doctors. After adding up the time she spent writing pre-visit reports, driving, conducting the visits, writing post-visit reports, and completing other tasks, Smith worked more than eight hours per day.

Smith earned a base salary of $66,000 but was not paid overtime, though J & J, at its discretion, could award her a bonus. J & J considered the number of Concerta prescriptions issued in Smith's territory in determining her bonus. The collection of this data and its direct relationship to Smith's efforts was, however, subject to error as purchasers might fill their prescriptions in another territory or with a pharmacy that would not release the pertinent information to J & J.

593 F.3d at 282-83 (alteration in original) (citation omitted).

Emphasizing the Third Circuit's consideration of the plaintiff's deposition testimony, the plaintiffs here, supported by the Secretary, contend that the decisions of the Second and Third Circuits are not in conflict. Such a view simply distracts from the very real disagreement between those circuits. It is true that the *Smith* case included damaging deposition admissions by the plaintiff: She characterized her job as the manager of her own business. Nevertheless, the court's ultimate analytical focus was, quite properly, on the nature of her day-to-day duties, duties strikingly similar to those of the plain-

tiffs in *Novartis* and to the plaintiffs in the cases now before us. It is those day-to-day duties on which a proper analysis under the FLSA rests, not merely the parties' characterizations of those duties as involving discretion or not. *See Roe-Midgett*, 512 F.3d at 870.

Our examination of the records in these cases convinces us that the representatives were required to exercise a significant measure of discretion and independent judgment, despite the constraints placed on them, and indeed on all representatives of the pharmaceutical industry, by the regulatory environment in which they must live. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (7th Cir. 2005) (noting that the presence of strict regulatory limits channeling employee discretion did not prevent exercise of independent judgment). Indeed, despite these constraints, it is in the core function of the representatives' duties, the physician office visits, that we see the most important exercise of discretion and professional judgment on their part. Although the regulatory constraints of the industry dictate that the representatives must deliver the pharmaceutical companies' messages with precision, the representatives nevertheless are sent into physicians' offices with minimal supervision to engage in conversation with the prescribing physicians who, as a practical matter, are in the most direct position to determine whether their companies' products have a viable market. In speaking to individual physicians, the representatives must tailor their messages to respond to the circumstances, whether those be the time or attention constraints from the physician or the concerns and objec-

tions that are voiced during a particular or previous visit. *See supra* note 9 (quoting the representatives' own descriptions of their physician interactions). Indeed, although the companies gave the representatives precise wording and materials, they certainly did not treat the representatives as simple mouthpieces, reciting scripts. The records show that, although most representatives had no medical background, the companies trained them extensively in disease processes, their own assigned products and products manufactured by competitors; indeed, they were tested in their substantive knowledge. The level of attention given to substantive education demonstrates that the company viewed these individuals as employees needing a solid understanding of the message that they were delivering if they were to fulfill their roles as the company's representative to the community of practicing physicians. A significant amount of discretion is no doubt required to determine when the physician's inquiry is sufficiently nuanced to require a response from a more knowledgeable individual than the representative himself. The representative who is unable to tailor the conversation to the time and circumstances, or to engage the physician in an intelligent conversation, is understandably not an effective representative to the professional community whose estimation of the company is key to its success.

Beyond these physician interactions, which we consider to be the critical function of the job and the place in which discretion is most evident, the representatives' other duties related to the actual call on the physician also manifest a substantial measure of judgment.

Although representatives are given specific call plans identifying the physicians to be visited and the degree of frequency or priority category for each physician, several representatives testified that they apply a measure of strategic analysis to their work, choosing to see physicians not on their call plans or non-physicians who may influence prescribing patterns. *See supra* note 14 (describing discretion applied to call plans). They work collaboratively with one another, proposing comprehensive visit plans for the territories and checking in regularly by phone to keep each other abreast of developments in particular visits with physicians. Representatives also spend the vast majority of their time entirely unsupervised. Although they keep extensive records, through which management can and does monitor their progress, neither the fact that management reviews their work nor that they are required to keep such records detracts from the discretion they exercise in the core of their workday. *See* 29 C.F.R. § 541.202(c) (regarding review by supervisors); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 538 (7th Cir. 1999) ("Just because an employee may spend a significant portion of his time engaged in ministerial or routine tasks does not necessarily prevent the application of the administrative exemption.").

As the Second Circuit noted in *Novartis*, there are a number of tasks listed in the regulations as "[f]actors to consider" in determining whether an employee exercises discretion that are clearly not present in this case. *See* 29 C.F.R. § 541.202(b). We previously have acknowledged, however, that the nature of a large, modern busi-

ness does not permit any one employee to exercise all of the functions listed in these general regulations. *See Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982-83 (7th Cir. 2011) ("It is true that the regulation, only a few provisions of which we have quoted (it goes on and on), lists a number of 'administrative' functions that the plaintiff did *not* perform, such as negotiating contracts with MediaBank's customers. But below the highest executive level a modern business is a congeries of specialists." (emphasis in original)). The ultimate question is not whether the plaintiff did all, or any, of the specific tasks listed in § 541.202(b); the list identifies itself as exemplary and non-exhaustive.

Indeed, in the preamble to the current regulations, after setting forth the factors now listed in § 541.202(b), the Secretary continues:

> Other factors which federal courts have found relevant in assessing whether an employee exercises discretion and independent judgment include *the employee's freedom from direct supervision*, personnel responsibilities, troubleshooting or problem-solving activities on behalf of management, *use of personalized communication techniques*, authority to handle atypical or unusual situations, authority to set budgets, *responsibility for assessing customer needs*, *primary contact to public or customers on behalf of the employer*, *the duty to anticipate competitive products or services and distinguish them from competitor's products or services*, advertising or *promotion work*, and *coordination of departments*,

*requirements, or other activities* for or on behalf of
employer or employer's clients or customers.

69 Fed. Reg. at 22,144 (emphasis added). Although
certain of these specific factors clearly apply to the
present case, the most important point is that this
passage makes clear that the determination of discretion
is a circumstance-specific one that will look different
from industry to industry and position to position. This
list of factors is not a checklist; it is a guide. The particular
discretion exercised by the representatives before us is
within the range of cases in which the exemption has
been applied. *See, e.g., Verkuilen*, 646 F.3d at 982 (holding
that an account manager at a software company who
"[i]dentif[ied] customers' needs, translat[ed] them into
specifications to be implemented by the developers, [and]
assist[ed] the customers in implementing the solutions"
qualified for the administrative exemption); *Piscione*,
171 F.3d at 535-36 (concluding that a human resources
consultant exercised discretion in his duties by, among
other things, "improv[ing] client services" and being
"responsible for several clients"); *John Alden*, 126 F.3d at
13 (finding sufficient discretion where "the marketing
representatives rely on their own knowledge of an
agent's business to help tailor proposals for the agent's
end-customers" and are "able to anticipate the
competing products that the agent's customers might be
considering, and distinguish John Alden's offerings
from those of competitors").

Finally, the plaintiffs and the Secretary briefly contend
that the work of the representatives principally involves

the application of skill, rather than judgment. Although they are correct that the regulations draw this distinction and caution that skill is insufficient to warrant the exemption, skill and judgment are not mutually exclusive. The records clearly demonstrate that the representatives receive extensive skills training, particularly on sales techniques. They most certainly employ this skill, and, indeed, many others in the course of their daily duties. Nevertheless, applying these skills entails a great deal of judgment. The job requires far more than "applying well-established techniques, procedures or specific standards described in manuals." 29 C.F.R. § 541.202(e). It does not involve simple "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." *Id.*

## Conclusion

The pharmaceutical sales representatives employed by Abbott and Lilly in these cases are properly characterized as exempt administrative workers. In case number 10-3855, we therefore affirm the judgment of the district court.[24] In cases 11-1980 and 11-2131, we reverse the

---

[24] With respect to case number 10-3855, Ms. Schaefer-LaRose also argues that the district court erred in failing to apply the Second Circuit's opinion in *In re Novartis Wage & Hour Litigation*, 611 F.3d 141 (2d Cir. 2010), to her New York state law claims.

With her motion to reconsider pending before the district court, Ms. Schaefer-LaRose supplemented the record, providing

(continued...)

judgment in favor of the plaintiff class, and we direct the court to enter judgment in favor of Abbott.

No. 10-3855, AFFIRMED;
Nos. 11-1980 and 11-2131, REVERSED and REMANDED
with INSTRUCTIONS

---

[24] (...continued)
the court with a citation to the Second Circuit's opinion in *Novartis*, in which the court held that pharmaceutical sales representatives are not exempt under the FLSA. Yet, in doing so, she made no argument with respect to her state law claims, and we therefore conclude that this argument is forfeited. *See Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983, 1005 (7th Cir. 2003) (noting that arguments not raised before the district court are forfeited).

We further note that, in its opinion, the Second Circuit explicitly acknowledged that neither party had challenged the district court's conclusion that there was no meaningful distinction between state and federal law. The Second Circuit accordingly treated the exemptions the same under both state law and the FLSA.

---