RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JUDITH PERRY; ERIN LANE; AIMEE DOOLING,

        *Plaintiffs-Appellants,*

    *v.*

RANDSTAD GENERAL PARTNER (US) LLC,

        *Defendant-Appellee.*

No. 16-1010

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:14-cv-11240—John Corbett O'Meara, District Judge.

Argued: November 30, 2016

Decided and Filed: November 20, 2017

Before: MOORE, SUTTON, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jordan M. Lewis, KELLEY/UUSTAL, PLC, Fort Lauderdale, Florida, for Appellants. Jennifer A. Riley, SEYFARTH SHAW LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Jordan M. Lewis, KELLEY/UUSTAL, PLC, Fort Lauderdale, Florida, Barry S. Fagan, Jennifer L. McManus, FAGAN MCMANUS, P.C., Royal Oak, Michigan, for Appellants. Jennifer A. Riley, Gerald L. Maatman, Jr., Ashley C. Workman, SEYFARTH SHAW LLP, Chicago, Illinois, for Appellee.

WHITE, J., delivered the opinion of the court in which MOORE and SUTTON, JJ., joined in part. MOORE, J. (pp. 34–37), delivered a separate opinion concurring in part and dissenting from the court's opinion regarding matchmaking duties. SUTTON, J. (pp. 38–40), delivered a separate opinion concurring in part and dissenting from the court's opinion regarding sales duties.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.   In this putative collective action under the Fair Labor Standards Act (FLSA), Judith Perry, Erin Lane, and Aimee Dooling (Plaintiffs) appeal the district court's grant of summary judgment to their employer, Randstad General Partner (US) LLC (Randstad), rejecting their argument that Randstad improperly classified them as exempt employees not entitled to overtime pay.   We **AFFIRM IN PART** and **REVERSE IN PART**.

## I.  BACKGROUND

Randstad is a staffing company; it recruits temporary workers (talent) and hires them out to other companies (clients).   Plaintiffs were in-house Randstad employees (not temporary workers hired out) in the company's Troy, Michigan, office.   Each Plaintiff held multiple positions over the course of her employment with Randstad, but Plaintiffs' responsibilities generally included marketing and selling Randstad's services; recruiting and evaluating workers and placing them with clients; overseeing those placements; and various administrative and clerical tasks.   Randstad tracked Plaintiffs' performance using a points-based system called the Work Planning Index (WPI).   Each work activity earned a set number of points, e.g., two points for interviewing a recruit and one point for completing reference checks.   Plaintiffs were required to accrue 100 points each week.   Of those 100 points, Plaintiffs were expected to earn a certain number in particular categories, such as sales and recruiting.   Randstad maintained a progressive discipline system for employees who did not meet the 100-point quota each week, with penalties up to and including termination.

Randstad also held periodic "contests," which required Plaintiffs to perform a particular task a specified number of times in a given week, e.g., make 40 telephone connections with potential new customers via cold calls.   According to Plaintiffs, participation in these contests was mandatory for all employees in the Troy branch, regardless of job description or title, even if the "contest" task was not within an employee's regular duties, thereby taking time away from meeting the category quotas.   Further, while all employees accrued points for the contest

activities, their category quotas did not change simply because a contest was taking place. Thus, if a contest required an employee to perform tasks outside her regular duties, she might have to earn more than 100 points total in order to accrue enough points in each category to meet all her quotas.

According to Plaintiffs, the quotas set by Randstad and enforced through the WPI system were impossible to meet working only 40 hours per week. As a result, Plaintiffs regularly worked significantly more than 40 hours per week, and Randstad managers were aware they did so.

## II. PROCEDURAL HISTORY

Perry, Lane, Dooling, and a fourth plaintiff, Suhaima Choudhury, filed this suit in March 2014. The one-count complaint seeks unpaid overtime and liquidated damages under the FLSA, attorneys' fees, costs, and a declaratory judgment that Randstad's practices are unlawful. Plaintiffs styled their complaint as a collective action, and sought to represent all similarly-situated staffing employees who worked for Randstad in the three years prior to the commencement of the lawsuit.

Randstad answered the complaint in May 2014, and the parties spent several months engaging in discovery. Subsequently, Plaintiffs filed a motion for conditional class certification, and Randstad filed a motion for summary judgment seeking the dismissal of all four named plaintiffs' claims. After a joint hearing on both motions, the district court granted summary judgment to Randstad on the claims brought by Dooling, Lane, and Perry, but allowed Choudhury's claims to proceed. Based on Plaintiffs' own testimony, the court found that Dooling, Lane, and Perry exercised discretion and independent judgment, and therefore were covered by the administrative exemption to the FLSA.[1] The court also found that Randstad was insulated from any liability because it relied, reasonably and in good faith, on an opinion letter issued by the Department of Labor's (DOL) Wage and Hour Division (WHD). Finally, the court

---

[1]Choudhury's claim was different from the other plaintiffs'. Choudhury was actually classified as non-exempt, but alleged that Randstad ordered her not to record the overtime hours she actually worked.

denied the certification motion on the merits as to Choudhury, and as moot as to the other Plaintiffs.

Plaintiffs timely filed a Rule 60 motion for relief from the order granting summary judgment. Plaintiffs argued that certain WPI-related reports produced by Randstad after summary judgment was granted constituted new evidence sufficient to justify relief. Plaintiffs reasoned the reports showed Randstad used the WPI to compare and evaluate employees, and created a triable fact issue regarding how much discretion Plaintiffs had. The district court denied the motion, concluding that ranking employees based on how many points they earn "is not inconsistent with those employees using independent judgment and discretion in how they complete their work." (R. 104, PID 2416.)

Finally, after Choudhury's claims were resolved by the parties and voluntarily dismissed, the remaining parties stipulated to the entry of judgment. This appeal followed.

### III. DISCUSSION

Plaintiffs contend the district court erred both in finding Randstad eligible for the good-faith-reliance defense and in finding the FLSA's administrative exemption applicable.[2,3]

### A. Standard of Review

We review the district court's decision granting summary judgment de novo. *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 643 (6th Cir. 2013) (citations omitted). "Summary judgment is appropriate if, examining the record and drawing all inferences in a light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 399 (6th Cir. 2004).

---

[2]Plaintiffs do not challenge the district court's denial of their Rule 60 motion.

[3]Below, Randstad also made arguments based on the statute of limitations and the executive, outside sales, and combination exemptions, and challenged Plaintiffs' entitlement to liquidated damages. The district court did not address those issues, and neither party raises them on appeal.

**B.  The Administrative Exemption**

1.  Applicable Law

The FLSA was enacted "to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost." *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948).  "Consistent with this goal, the [FLSA] requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week, but exempts 'bona fide executive, administrative, or professional' employees from the overtime pay requirements." *Acs v. Detroit Edison Co.*, 444 F.3d 763, 764–65 (6th Cir. 2006) (quoting 29 U.S.C. § 213(a)(1); other citations omitted) (brackets and other internal quotation marks removed).  "Congress did not define these exemptions, but delegated authority to the Department of Labor . . . to issue regulations to define and delimit these terms." *Foster*, 710 F.3d at 642.

At all times relevant to this litigation, the operative regulation provided that an "employee employed in a bona fide administrative capacity" is one who is:

> (1) Compensated . . . at a rate of not less than $455 per week . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a);[4] *Foster*, 710 F.3d at 642.  "The exemption is to be narrowly construed against the employer, and the employer bears the burden of proving each element by a preponderance of the evidence." *Foster*, 710 F.3d at 642 (citing *Renfro v. Ind. Mich. Power Co.*,

---

[4]The text of subsection (a)(1) was slated to change on December 1, 2016, to read:  "Compensated . . . at a rate per week of not less than the 40th percentile of weekly earnings of full-time nonhourly workers in the lowest-wage Census Region." *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32391, 32549 (May 23, 2016).  The United States District Court for the Eastern District of Texas has enjoined the DOL from implementing or enforcing that change, along with certain other proposed changes to Chapter 541. *Nevada v. U.S Dep't of Labor*, 218 F. Supp. 3d 520 (E.D. Tex. 2016).  Neither the proposed change to 29 C.F.R. § 541.200(a)(1) nor the injunction has any effect on this case.

497 F.3d 573, 575–77 (6th Cir. 2007) (*Renfro II*));[5] *see Auer v. Robbins*, 519 U.S. 452, 462 (1997). Here, the parties agree that the first two elements are met. Further, Plaintiffs do not argue that their duties did not involve "matters of significance." Thus, the only issue is whether Plaintiffs' "primary dut[ies] include[d] the exercise of discretion and independent judgment." 29 C.F.R. § 541.200(a)(3).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Whether a particular employee exercises discretion and independent judgment must be determined "in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* § 541.202(b).

Additionally, "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). On the other hand, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e) (citing *id.* § 541.704); *Foster*, 710 F.3d at 646.

Finally, Plaintiffs' "primary duties" are what matter for purposes of the administrative exemption. 29 C.F.R. § 541.200(a)(3).

> The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom

---

[5]Some of our older opinions use the phrase "a preponderance of the *clear and affirmative* evidence." *See, e.g.*, *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 515 (6th Cir. 2004) (*Renfro I*) (emphasis added). We have since clarified that the use of that phrase was not intended to, and did not "heighten [a defendant]'s evidentiary burden when moving for summary judgment." *Renfro II*, 497 F.3d at 576.

from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a). Further,

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

*Id.* § 541.700(b).

### 2. Prior Precedent Related to Staffing Company Employees

We have not addressed the question whether staffing company employees such as Plaintiffs fall within the administrative exemption. Nor, as best we can tell, has any other federal Court of Appeals. Several district courts and the WHD have addressed the question, however.

First, by regulation:

Human resources managers who formulate, interpret or implement employment policies . . . generally meet the duties requirements for the administrative exemption. However, personnel clerks who 'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption.

29 C.F.R. § 541.203(e).

Second, when applying the relevant regulatory provisions to staffing company employees, the WHD and the courts have considered the specific facts of each case and more often than not found that such employees exercise discretion and independent judgment.

In *Andrade v. Aerotek, Inc.*, the plaintiff's job titles were, successively, "Recruiter," "Recruiter II," and "Account Recruiting Manager." 700 F. Supp. 2d 738, 740–41 (D. Md. 2010). The key aspects of the plaintiff's duties were: (i) "[s]he did not screen solely for minimum

qualifications, but often sent candidates to her Account Managers whose personalities made them a good fit, even when their qualifications were not as impressive as others;" (ii) she "negotiated overall pay, holiday pay and vacation pay;" (iii) she "managed the contract employees while on assignment, assessed and investigated contractor problems, and counseled and disciplined contractors;" (iv) she "was not subject to immediate direction or supervision;" and (v) she "was in charge of generating business" in certain areas from a particular client. *Id.* at 747–48. Citing those factors, and further reasoning that "[t]he fact that she would consider a particular range when negotiating pay does not mean she did not exercise discretion," the court found that the plaintiff exercised discretion and independent judgment. *Id.* (citation omitted).

In *Quintiliani v. Concentric Healthcare Solutions, LLC*, the plaintiff was a "Staffing Coordinator." 944 F. Supp. 2d 738, 741 (D. Ariz. 2013). Her duties included managing client relationships and "counseling and discipline of staff who did not comply with the client's policies or procedures." *Id.* at 746–47. She was also responsible for "implement[ing] important management policies and operating practices" and doing so "in a manner that would ensure that the medical professionals placed with the clients were capable of producing good medical services." *Id.* For that reason, the court found that the plaintiff "exercised discretion and independent judgment." *Id.* at 747 (citation omitted); *see also Gonzales v. Barrett Bus. Servs., Inc.*, No. CV-05-0104-EFS, 2006 WL 1582380, at *21 (E.D. Wash. June 6, 2006) (using FLSA standards to interpret a parallel Washington statute and concluding an employee who performed a range of recruitment, hiring, placement, and supervisory duties exercised discretion and independent judgment); *accord Hudkins v. Maxim Healthcare Servs., Inc.*, 39 F. Supp. 2d 1349, 1349 (M.D. Fla. 1998) (holding the administrative exemption applied to an employee who recruited and placed nurses, but without analyzing discretion and independent judgment).

The WHD reached the same conclusion in its most recent relevant decision. In 2005, the WHD was asked whether "Staffing Managers" at a particular "temporary staffing agency" qualified for the administrative exemption. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2005 WL 3308616, at *1 (Oct. 25, 2005) (the 2005 WHD Letter). The Staffing Managers' primary duties were to manage the function of providing temporary workers to the company's clients. *Id.* This involved: (i) evaluating what skills were needed; (ii) negotiating

the terms for the placement and the fee to be paid; (iii) recruiting and selecting workers, including evaluating recruits' education, skills, and personality, not merely checking against minimal requirements; (iv) recommending workers to clients; (v) negotiating the wages paid to workers; (vi) supervising workers; and (vii) counseling and disciplining workers, including transfers and terminations, if necessary. *Id.* The Staffing Managers "work[ed] under very little supervision" and "ma[d]e decisions and accomplish[ed] their tasks without prior approval and with broad range of discretion." *Id.* They also decided whether advertising was necessary to fill a position, "determine[d] where to place the advertisement," and "negotiate[d] the costs of such placement." *Id.* at *2.

In analyzing these duties, WHD pointed to the contrast between human resource managers (covered by the exemption) and personnel clerks (not covered), and concluded that the Staffing Managers exercised the requisite discretion and independent judgment to qualify for the administrative exemption because it was their job to: "recruit; interview; hire and recommend placement of employees to particular assignments; manage the client's temporary labor pool; provide advice on personnel issues; handle complaints; resolve grievances; and terminate employees on behalf of the client's management." *Id.* at *3 (citing 29 C.F.R. §§ 541.202(b), 541.203(e)); *see also* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1970 WL 26434, at *1 (Aug. 11, 1970) ("Senior Employment Consultant" placing salaried professional workers found to exercise requisite discretion and independent judgment, where he was "responsible for making in depth interviews," had "complete authority and sole responsibility" for deciding which applicants to refer to clients, served as "primary liaison" with certain clients, and was subject to less supervision than "other employment consultants").

The only contrary case cited by Plaintiffs is *Ogden v. CDI Corp.*, No. CV08-2180 PHX DGC, 2010 WL 2662274 (D. Ariz. July 1, 2010). The plaintiff's duties in *Ogden* were to: (i) search for qualified individuals; (ii) determine whether a candidate's background matched the client's requirements based on both subjective and objective factors; and (iii) determine the candidate's salary requirements. *Id.* at *3. The plaintiff would then "provide the resumes of qualified candidates to his account manager," who would "decide whether to present those candidates to the client." *Id.* If the account manager did so, and the client was interested, the

plaintiff would schedule an interview between candidate and client. *Id.* And if the client wanted to hire the candidate, the plaintiff would call the candidate to make the offer. *Id.* However, there was no evidence that the plaintiff "hired or fired candidates, made direct recommendations to clients, or managed and disciplined candidates," nor any evidence he had "formulated, interpreted or implemented employment policies." *Id.* at *3, *5 (quoting 29 C.F.R. § 541.203(e)) (brackets removed). On that basis, the court distinguished the 2005 WHD Letter, *Andrade*, and other staffing-company cases, and found that the defendant had not shown the plaintiff was covered by the administrative exception as a matter of law. *Id.* at *3–*5.

### 3. Facts

As the preceding discussion makes clear, determining what an employee's primary duties are and whether they are covered by the administrative exemption is a fact-intensive inquiry. "We focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations." *Schaefer*, 358 F.3d at 400 (citing *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 688 (6th Cir. 2001)). We therefore set out in detail the record evidence relevant to this issue.

#### a. Judith Perry

Perry was a Staffing Consultant from February 2012 to August 2013 and a Senior Staffing Consultant from August 2013 to December 2013.[6]

##### i. Staffing Consultant Duties – February 2012 to August 2013

As a Staffing Consultant, Perry recruited for "temp, temp to perm, and permanent positions" in office and administrative roles, such as receptionist, filing clerk, payroll, administrative assistant, and call-center jobs. She testified:

---

[6]Some documents in the record refer to Perry's second job as "Staffing Manager." Since the parties both use the title "Senior Staffing Consultant" on appeal, we do as well.

it's sort of like your own business. You do everything from the beginning to the end. So you bring in the new business, you handle existing business, you help find the employees, you get them signed up and registered and on the payroll of Randstad. And then you let them go or you -- whatever. It's the whole gamut.

(R. 55-2, PID 605.)

Perry was required to earn an average of 100 points per week for completing various job-related activities, e.g., making calls, opening a new account, making a placement. Perry was also required to earn a certain number of points in particular categories, such as sales or recruiting. As long as she met those targets, she could choose which tasks to perform on any given day. As she put it:

[T]here was a choice of how you got your points, but you had to make sure that you had so many points in new business development, so many points in existing, in candidates, you know, in the recruiting. It was -- it was cafeteria style, but you had to -- it was tight. I mean, you still had to get in certain categories.

(R. 67-6, PID 1518.)

From Perry's perspective, her most important duty as a Staffing Consultant was "selling Randstad services." (*Id.* at 1520.) To do so, Perry would attend networking events, contact existing clients, cold call prospective clients, and knock on doors. She sent out marketing materials to clients pursuant to Randstad policies. She chose for herself which networking events to attend. When it was time for a door-knocking "blitz," however, branch management would select an area and assign streets to each team member. For existing clients, Randstad prescribed a schedule for when to reach out to them about potential vacancies; Perry was expected to call each client within a day or two of the date set by Randstad. The process was the same for prospective clients, except that Perry was also expected to use her own network and initiative to add new prospects, and she assisted or mentored other employees in these "prospecting" activities. New prospects had to fit certain criteria set by Randstad, but Perry decided which prospects to add and whether to classify them as serious or secondary prospects.

Once a client agreed to have Randstad fill a vacancy, Perry was responsible for getting the client to sign a written agreement. She then interviewed and presented candidates to the client. This involved completing paperwork and sometimes arranging for drug tests. The client

then interviewed the recommended candidate(s), and once the client made a selection, Perry would hire the candidate.

Randstad used template contracts with its clients. The default goal was for Randstad to receive 160% of what it would pay the candidate (a 60% "mark-up"). If a client declined to pay the 60% mark-up, Perry could negotiate down to 58%, but only with permission from management. Perry was encouraged to negotiate for a mark-up above 60%.

As to recruiting, Perry's responsibilities included "[f]inding talent, interviewing talent, [and] hiring talent." (*Id.* at 1531.) She attended job fairs, posted on and searched social media and various careers-focused web sites, wrote job descriptions, and conducted interviews. Some of this outreach was dictated by Randstad, while some was up to Perry, such as talking to her own contacts. When writing a job description, Perry used Randstad's resources to compile a list of the skills necessary for a particular job. Randstad's procedures were very rigid, and it was Perry's responsibility to translate the information about the job provided by the client into Randstad's required format.

When recruiting candidates, Perry was required to first post each position to Randstad's system, which broadcast it out to various external sources. If that did not produce sufficient qualified candidates, Perry would manually search social media and career-focused web sites; it was up to her to decide which resources to use. Separately, Perry would sometimes actively recruit candidates with certain high-demand skills and then look for a client to place the candidate with.

Once Perry identified a potential candidate for an open position, she would conduct a phone screening. Phone screenings generally followed a script provided by Randstad, but Perry could deviate to some extent based on the job in question. The purpose of the phone screenings was both to confirm the candidate had the objective qualifications necessary for the job and to determine if the candidate displayed proper phone etiquette. Perry made the decision whether a candidate should receive an in-person interview.

In-person interviews followed an outline provided by Randstad. There were predetermined questions to ask based on the skills needed for the job in question, to which Perry

could add, but not subtract. Perry also determined which skills tests to give a candidate, again based on the client's needs and Randstad's large set of available tests. After an interview, it was Perry's decision whether a candidate met Randstad's requirements. Perry had discretion in evaluating subjective criteria like communications skills and whether a candidate made appropriate eye contact.

As to placements, "Randstad was big on boss, company and culture fit." (*Id.* at 1537.) In addition to the information gained during the phone screening and interview process, Perry considered a candidate's work history, such as whether the candidate had previously worked in the client's industry or for companies of a similar size.

After a placement was made, Perry was responsible for "keeping the relationship going." (*Id.* at 1531.) For example, Perry "ma[de] sure the candidate was okay and happy and liking what they were doing," "ma[de] sure that they stayed at the positions they were in," and, "[i]f they called in sick, we had to field those calls and then alert the client that the candidate wasn't going to be there, but make sure that we had a back-up for them if they needed a back-up talent." (*Id.*) Randstad set a fixed schedule to follow in checking on new placements. If a placement was not working out, Perry would address it:

> We would coach them, find out what the problems were, what the issues were, if the client -- first of all, we would have to find out from the client if they wanted to keep the candidate. The talent. If they wanted us to replace them, we would have to replace them. We would have to wait until the talent went home, and then call them after they got home to let them know they weren't going back the next day.

(*Id.* at 1538.) Perry further explained:

> I would usually call the candidate, find out how it was going, how the job was going, did they find -- were there any challenges that they were having. And then I would get -- give them feedback and let them know this is what you need to do to step it up, or this is what you need to do to improve, this is what you need to do to -- you know, to keep your position.

(*Id.*)

Perry estimated that, as a Staffing Consultant, she spent two hours or more per day "prospecting"—calling clients and prospective clients about potential openings. She spent about

an hour each day visiting clients and prospective clients in person. Perry spent about another 4.5 hours per month taking clients and prospective clients of her choosing out for meals. Perry also spent 2–3 hours per month at networking events. It is not clear how the remainder of her time was divided. Perry's base hours were 9:00 a.m. to 5:00 p.m., but she could vary her hours somewhat as long as she met the 100-point quota. In practice, Perry typically worked from 7:00 a.m. to 5:30 or 6:00 p.m., and ate lunch at her desk. She worked some Saturdays and averaged 55 hours per week.

### ii. Senior Staffing Consultant Duties – August 2013 to December 2013

Perry testified that her duties did not change when she was promoted to Senior Staffing Consultant. She was expected to do more client visits than in her previous role, but she did not spend more or less time on that task. Perry was also expected to generate more new clients each month, so she spent more time prospecting, but she did not say how much more, nor did she say whether that meant less time on other tasks, or whether she simply worked more hours in total. Perry may have been given a new position description (which has not been identified in the record by either side), but was not told of any change in her duties or in how her performance would be reviewed.

### b. Erin Lane

Lane was a Talent Acquisition Specialist from December 2011 to February 2012, an Account Manager from February 2012 to August 2012, a Senior Account Manager from August 2012 to February 2013, and an Assistant Branch Manager from February 2013 to July 2014. Her testimony about the 100-point quota was substantially the same as Perry's.

### i. Talent Acquisition Specialist Duties – December 2011 to February 2012

Lane began working for Today's Office Professionals in April 2010 as a staffing consultant. Her duties were "[t]o recruit candidates for temporary, temp to hire, and direct hire positions," to "[m]onitor weekly payroll," to "[d]o hiring orientations," and to "assist clients and candidates and employees with any questions, concerns, problems, [and] pretty much be there to be like a customer service representative for them." (R. 36-6, PID 345.) Today's Office

Professionals was purchased by Randstad in December 2011 or January 2012. Lane's title became Talent Acquisition Specialist.

Lane testified that after the switch to Randstad, she "did not have any sales expectations" and had no responsibility for searching for new clients. (R. 67-7, PID 1556.) However, Lane later testified that upper management expected Talent Acquisition Specialists to try to develop sales leads for other employees to follow up on. Lane also testified that she *did* visit prospective clients, because she "did not function as a true talent acquisition specialist" due to the difficulty in fitting her existing duties into the Randstad hierarchy. (R 36-6, PID 346; R. 67-7, PID 1560.)

There is no evidence in the record as to how many hours, or what percentage of her time, Lane spent on particular tasks as a Talent Acquisition Specialist.

### ii. Account Manager Duties – February 2012 to August 2012

Lane was promoted to Account Manager in February 2012. She testified that "[i]t was the same duties that I was doing in concept before." (R. 67-7, PID 1559–60.) She "was still recruiting and handling payroll, handling hiring paperwork[], interviewing, working with clients, everything that I was used to doing . . ." (*Id.* 1560.) And she continued to visit prospective clients.

Upon becoming an Account Manager, Lane worked with all of the branch's clients. (*Id.*) Later in 2012, Randstad divided the clients based on location and whether the client "was a national account or a retail account." (*Id.*) Lane testified that she "was given control over all national accounts, which were our larger firms. I did still support a few retail accounts that I had positive relationships with." (*Id.*)

Lane testified that two of her duties were the most important: "to make sure that . . . our clients had what they needed or were requesting from us, and . . . finding the best candidate for [each] opening." (*Id.*) Lane was presented with a job description for an Account Manager at her deposition (which is not in the record), but testified that it did not match her actual responsibilities. She explained that "it does not include that you were required to process payroll, hire candidates and go through all of the hiring paperwork and training with them"—

tasks that were "quite frequent and time consuming." (*Id.* at 1561.) Lane also testified that the job description was inaccurate because her sales responsibilities focused "more within current customers than new development." (*Id.*) She called or emailed current clients about once per week "to make sure that they were happy." (*Id.* at 1562, 1574.) But since she already knew their needs, there was little need to try to sell to them. As Lane put it: "We built relationships to make sure that they were happy," so that "when they had a need . . . we would get the business." (*Id.* at 1562.)

When one of Lane's clients needed to fill a position, the client would either contact her directly or via a Randstad database. If the position was highly-paid or not an administrative job (e.g., warehouse laborer), Lane would refer it to another Randstad division. She "was . . . tracked on how many orders [she] brought in from current customers." (*Id.* at 1565.) Lane wrote job descriptions independently, relying on her degree in human resources and publically available resources. She also prepared standard job descriptions for use by other branch employees. Lane worked collaboratively with other employees to determine the rate a worker would be paid.

Lane's description of the process for identifying candidates was similar to Perry's (use of social media and internet resources, phone screenings, in-person interviews). However, Lane testified that it was her decision whether to post an available position through Randstad's system or to search for candidates in other ways. Regarding recommending candidates, Lane testified that it was important to match candidates to clients: "If somebody was really, really bubbly, we wouldn't want to put them with a client that had a very calm and quiet environment. They wouldn't do well there." (R. 55-3, PID 678.) Lane elaborated:

> We had some [clients] that were very laid back, and you could wear jeans to work every day . . . . Somebody that had a very corporate personality and needed direction and didn't have so much of a creative mind wouldn't fit well there. So we would look to place them at more of a corporate office. So we talked to them in the interview about . . . what would your ideal workplace look like, what would your ideal manager do . . . . Things of that nature to try and make sure we put them in the best spot. Because many times we had . . . more than one position open that they could fit for. And then it came down to environmental fit, because that's just as successful as to whether or not they can do the job.

(*Id.* at 680–81.)  Lane made the ultimate decision which candidate(s) to recommend to a client. She was also part of a team that decided how much to bill clients, but she did not have ultimate decision-making authority.

As to dealing with unsuccessful matches, Lane testified that it was her role to coach the workers "at least once." (*Id.* at 686.)  If the problem continued, Lane employed warnings and additional coaching.  Normally, Lane had the authority to decide what intermediate steps to take. (*Id.* at 688–89.)  Sometimes, "something happened that justified immediate termination," and Lane would fire a worker. (*Id.* at 687.)  Other times, the client made the final decision and Lane carried it out.  Lane advised clients on whether termination was appropriate. (*Id.* at 688.)  She was involved in coaching or firing someone "at least once a week." (*Id.* at 689.)  In a broad sense, Lane was the intermediary between the client and the worker for all issues which might arise.

Further, Lane continued to assist other Randstad in-house employees with new client or prospective client visits, doing so about once per month.  She would make three or four cold calls to prospective clients per week, based on leads derived from her own network, "even though that was not [her] job requirement." (R. 67-7, PID 1571.)  Lane also attended networking events to promote Randstad and build the branch's candidate pool.  She attended these events about once per quarter, and each event took two to three hours.  Finally, Lane conducted annual visits to each client to insure the workplace was safe according to prescribed criteria.

Lane had a "small" amount of flexibility to order her own work by deciding which tasks to do when, "[a]s long as at the end of the week, [she] still had the hundred points and [she] had met all expectations." (*Id.* at 1574.)  Aside from the information about networking events, there is no evidence in the record regarding exactly how many hours, or what percentage of her time, Lane spent on particular tasks as an Account Manager.

### iii.  Senior Account Manager Duties – August 2012 to February 2013

Lane was elevated to Senior Account Manager in February 2013.  Her responsibility for mentoring others increased, but otherwise her job duties did not change.  There is no evidence in

the record regarding how much time Lane spent on her various duties as a Senior Account Manager.

### iv. Assistant Branch Manager Duties – February 2013 to July 2014

After being promoted to Assistant Branch Manager in February 2013, Lane had new, additional duties. She "had authority to counsel employees internally." (*Id.* at 1566.) She was also responsible for handling "any escalated issue that one of my staff could not handle internally or with a client or employee." (*Id.*) Lane also had new reporting requirements, attended managers' meetings and conference calls, and traveled quarterly to Randstad's Chicago office. Additionally, she had increased responsibility for attending customer visits with the less-experienced sales staff to support them. Although "[e]veryone in the branch reported directly to [Lane]," and she participated in performance reviews and made recommendations about hiring and firing, Lane did not have ultimate authority to hire or fire employees. (*Id.* at 1566–67.)

Despite those new duties, Lane was still expected to earn her 100 points per week, and her individual performance metrics were "basically the same" as in her prior role. (*Id.* at 1569.) However, she "was required to develop more new business," including via cold calls. (*Id.*)

### c. Aimee Dooling

Dooling was a Staffing Consultant from December 2011 to September 2012, an Account Manager from October 2012 to August 2013, and a Senior Account Manager for a few weeks in August 2013. Her testimony about the 100-point quota was substantially the same as Perry's testimony.

### i. Staffing Consultant Duties – December 2011 to September 2012

As a Staffing Consultant, Dooling was "required to sell 50 percent of the time as well as recruit 50 percent of the time." (R. 67-2, PID 1462.) Selling meant "going out and finding new business," including "lots of phone calls, lots of cold-calling" and prospective client visits, if she was able to set them up. (*Id.*) Dooling was also responsible for sending out "lots of marketing material," much of which Randstad required her to hand-address or add a personal note to. (*Id.*) She was required to reach out to prospective clients in her assigned territory that met Randstad's

criteria. She used Randstad's database of potential contacts, and also conducted internet research and did cold calls to add new prospective clients to the database herself. Dooling also knocked on the doors of potential clients several times per month; when she did so, she would be away from the office for approximately half a day. Dooling generally used a script provided by Randstad to guide her cold calls and meetings with prospective clients.

If a prospective client was interested, Dooling would "send[] over contracts to solidify that relationship with the new client" and "start recruiting for that client's needs." (*Id.*) To do so, she would develop a "job order" based on the client's requirements. (*Id.* at 1464.) Dooling usually prepared job orders together with Lane, her supervisor. Dooling also negotiated the worker's pay and the billing rate to the client, although, again, "many times [she] did refer to management on that as well." (*Id.*) In negotiating, the range she could agree to was set by her managers. (*Id.* at 1478.)

As for recruiting, Dooling described her duties as:

recruiting online, bringing candidates in for face-to-face interviews, completing reference checks, doing what we called write-ups, so that is highlighting the candidate's skill sets and just bullet-pointing out maybe the skills that they have that the client is looking for. Also assisting in their resume itself, maybe cleaning it up, fixing grammatical errors, things of that nature. Preparing the candidate for the interview, following up after the interview with the client as well as the candidate. That also included occasionally phone interviews prior to a face-to-face interview or maybe a second interview with another manager.

(*Id.* at 1462.) Dooling also communicated with candidates after their interviews and, if a candidate was hired, handled the candidate's entry-on-duty paperwork. Once a candidate was placed with a client, Dooling followed up regularly with both the worker and the client to make sure the placement was a success.

From Dooling's point of view, "there wasn't one activity that was more important over another. All of your responsibilities were important." (*Id.*) Rather, what mattered most "was getting your hundred points." (*Id.*)

Dooling typically started work between 7:00 and 7:30 a.m., and left between 6:00 and 7:00 p.m. She ate lunch at her desk. She occasionally worked weekends.

ii. Account Manager and Senior Account Manager Duties – October 2012 to August 2013

Dooling was shifted from Staffing Consultant to Account Manager because she had developed a strong relationship with a particular client, and her best skill was "farming . . . current relationships" to get more business from existing clients. (*Id.* at 1466–67.) In her new role, she was "no longer . . . calling for new business." (*Id.* at 1467.) Otherwise, Dooling's new duties were "[v]ery similar" to her old duties. (*Id.*) She still went on client visits and called new managers at her existing national-account clients. She also reached out to Randstad's national customers with locations in her territory that were not yet using Randstad's services. Dooling was still responsible for generating business, but she did so via "relationship building" rather than cold calls. (*Id.* at 1468.) To that end, she sometimes took clients out for meals. Dooling also inspected new clients' workspaces for safety.

As an Account Manager, Dooling continued recruiting, conducting interviews, following up with candidates, and following up with clients. To match candidates and clients, Dooling focused on whether the candidate's skills were "transferable . . . to [the new] role" and whether the candidate "would be a good fit for [the client] or [the client's] environment." (*Id.* at 1473.) She also used reference checks to find out whether a candidate's past habits, such as punctuality, would satisfy the client's particular expectations. As Dooling explained:

> It was important to know [the client's] environment . . . the way the office was r[u]n, the hierarchy of the office . . . . [T]hat was something that Randstad wanted you to do, was really understand your client, really understand their needs. . . . It was about really knowing your client and really being that true business partner so that you could find that best fit for them, that true fit, so that they're going to come back to you.

(*Id.*) Randstad provided Dooling a list of questions to ask to help understand a client's business. Sometimes, Dooling also visited a client's office to sit in on the client's interview with a recommended candidate.

Dooling also continued to monitor placements for success. She "would do roundtable check-in . . . it was about things going on, like whether people maybe were showing up late or their attire they were choosing was inappropriate." (*Id.* at 1467.) She did "counseling, things of that nature." (*Id.*) If there was a problem, her goal was "[t]o have a peaceful ending," and to

make both the client and the candidate happy.  (*Id.* at 1481.)  However, Dooling also "had to go on site" if workers "needed to be fired."  (*Id.* at 1467.)  For example, one worker got into an argument with the client's on-site manager and "us[ed] some suggestive language."  (*Id.* at 1477.)  The client's on-site manager made the decision to terminate the worker, and Dooling carried out the firing.  On other occasions, "there would be opportunities to counsel" a worker, such as the time a worker reported to a job site "wearing stilettos and a low-cut shirt" that was "just not appropriate for a work environment."  (*Id.*)

One change in the new role was that Dooling now also "did on-site meetings" with clients that had concerns about their relationship with Randstad, or about issues in the news such as the Affordable Care Act; sometimes Dooling was accompanied by a manager, sometimes she went alone.  (*Id.* at 1470–71.)  Another change was that Dooling no longer negotiated her clients' billing rates, as they were set on a national basis.

Finally, Dooling testified that her supervisors closely scrutinized all of her work, and regularly reviewed her work plan for each day.

### 4.  Analysis

#### a.  Talent Acquisition Specialist

Lane worked as a Talent Acquisition Specialist from December 2011 to February 2012.  When asked at oral argument whether any Randstad employees are *not* covered by the administrative exemption, Randstad's counsel responded that its Talent Acquisition Specialists are not exempt because they are only involved in "sourcing candidates" and checking candidates against established criteria.  (Oral Arg. at 16:20.)  Because Randstad concedes Lane was not covered by the administrative exemption during her time as a Talent Acquisition Specialist, we need not analyze her duties during that period.[7]

---

[7]Randstad says nothing about the duties of Talent Acquisition Specialists or Lane's time in that role in its brief to this court.  Below, Randstad argued that Choudhury, a Talent Acquisition Specialist, was covered by the administrative exemption because she also performed exempt work.  Whether counsel intended to reverse that stance at oral argument, or was speaking generally about all Talent Acquisition Specialists *other* than Choudhury is immaterial.  Either way, counsel's concession covers Lane's time as a Talent Acquisition Specialist.

*b. Account Manager/Senior Account Manager*

Lane testified that she had more mentoring responsibilities after being promoted from Account Manager to Senior Account Manager, but that her duties were otherwise unchanged. And Randstad's brief to this court does not distinguish between the two positions. We therefore analyze them together.

To determine whether Lane and Dooling exercised discretion and independent judgment such that they were covered by the administrative exemption during their time as Account Managers, we must decide whether their "primary duty" was "the performance of exempt work." 29 C.F.R. § 541.700(a); *see id.* § 541.202(a). This requires a totality-of-the-circumstances analysis emphasizing "the character of the employee's job as a whole," informed by the non-exclusive list of relevant factors identified by the DOL. *See* 29 C.F.R. § 541.700(a).

With that in mind, we agree with the district court that matching candidates to clients based on fit—meaning subjective criteria such as the match between a candidate's personality and a client's corporate culture—as opposed to objective criteria such as years of experience or test scores, involves meaningful discretion and independent judgment. *Andrade*, 700 F. Supp. 2d at 747; *Quintiliani*, 944 F. Supp. 2d at 746–47); 2005 WHD Letter at *1; (*see* R. 94, PID 2229). So, too, does independently drafting job descriptions, deciding which recruitment tools to use, negotiating how much to pay the worker and how much to bill the client (even without ultimate decision-making authority), and counseling workers and otherwise dealing with unsuccessful placements. *Andrade*, 700 F. Supp. 2d at 747–48; *Quintiliani*, 944 F. Supp. 2d at 746–47); 2005 WHD Letter at *1. These responsibilities involved "the comparison and the evaluation of possible courses of conduct," and reflect the authority "to interpret[] or implement management policies or operating practices," to "represent[] the company in handling complaints," and "to make . . . independent choice[s], free from immediate direction or supervision" with respect to matching workers and clients. 29 C.F.R. § 541.202(a)-(c). Thus, during their time as Account Managers, Lane's and Dooling's matchmaking tasks fit within the administrative exemption.

We next ask whether those exempt matchmaking tasks were Lane's and Dooling's "primary dut[ies]" as Account Managers. *See id.* § 541.202(a). "[E]mployees who spend more

than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *See id.* § 541.700(b). Randstad offers no evidence showing how much time Lane and Dooling spent on exempt tasks. And Lane and Dooling both performed basic recruiting tasks during their time as Account Managers, which Randstad acknowledged at oral argument are non-exempt. (Oral Arg. at 16:20.) These tasks, such as handling payroll and processing workers' paperwork, were "quite frequent and time consuming." (R. 67-7, PID 1561.) Given the limited evidence presented, we cannot say that Lane and Dooling spent more than 50 percent of their time on exempt tasks as Account Managers. *See Schaefer*, 358 F.3d at 400–01 (finding summary judgment inappropriate, in part because the plaintiff's testimony created a factual dispute over whether he actually spent the majority of his time on exempt tasks).

That does not mean the administrative exemption is inapplicable, however. *See* 29 C.F.R. § 541.700(b). When asked at her deposition how important matching candidate to client was, Lane answered: "I would say about 50 percent." (R. 55-3, PID 684.) She also testified that her two most important duties were: "to make sure that . . . our clients had what they needed or were requesting from us, and . . . finding the best candidate for [each] opening." (R. 67-7, PID 1560.) Thus, while matchmaking may not have taken up the majority of Lane's and Dooling's time as Account Managers, matchmaking tasks were their "principal, main, major or most important duty." 29 C.F.R. § 541.700(a). Further, Lane had at least some flexibility to decide which tasks to do when, was given control over all national accounts, wrote her own job descriptions, chose her own recruitment tools, made the ultimate decision as to which candidates to recommend to her clients, and sometimes (but not always) fired workers without first consulting with the client or a supervisor. Thus, as an Account Manager, Lane had "relative freedom from direct supervision," which supports the conclusion that the administrative exemption applied. 29 C.F.R. § 541.700(a); *see id.* at § 541.202(c); *Andrade*, 700 F. Supp. 2d at 747–48; 2005 WHD Letter at *1.

Dooling had less independence than Lane. For example, she was more closely scrutinized by her supervisors, who regularly reviewed her work plan for each day. And there is no evidence Dooling ever hired or fired a worker on her own authority, as opposed to in consultation with a client or supervisor. However, "[t]he fact that an employee's decision may

be subject to review . . . does not mean that the employee is not exercising discretion and independent judgment." 29 C.F.R. § 541.202(c).[8]

Thus, considering all of the relevant record evidence, we agree with the district court that Lane's and Dooling's primary duties as Account Managers involved the exercise of sufficient discretion and independent judgment such that the administrative exemption applied.

### c. Staffing Consultant/Senior Staffing Consultant

We analyze Perry's and Dooling's work as Staffing Consultants together with Perry's work as a Senior Staffing Consultant because Perry's promotion did not change the nature of her duties, and because Randstad does not distinguish the two positions.

A Staffing Consultant's duties, like an Account Manager's, included a mix of exempt and non-exempt recruitment and placement tasks. Staffing Consultants had the same sort of

---

[8]It is true, as Judge Moore's partial dissent argues, that Randstad constrained Plaintiffs' discretion by establishing a points system and requiring adherence to Randstad's protocols and procedures. (Op. of Moore, J., at 34–36.) However, the fact that an employee's discretion is "somewhat circumscribed by her district manager's supervision and [the employer]'s standardized operating procedures" does not make the exemption inapplicable. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 507 (6th Cir. 2007). And neither the points system nor the protocols diminished Plaintiffs' subjective decision-making authority in determining whether candidates possessed sufficient communication skills or whether their personalities matched a client's profile and needs. Based on Plaintiffs' subjective assessment of a candidate, Plaintiffs made the ultimate determination whether a candidate as a whole was a good "boss, company and culture fit," and whether to recommend the candidate to a client. Thus, Plaintiffs' discretion in assessing and recommending candidates was "free from immediate direction or supervision." 29 C.F.R. § 541.202(c). The partial dissent also argues that Plaintiffs' matchmaking duties fall outside of the administrative exemption because "none of the Plaintiffs in this case had the authority to 'formulate' or even 'interpret' or 'implement' Randstad's policies." (Op. of Moore, J., at 34 (quoting 29 C.F.R. § 541.202(b)).) However, Plaintiffs' own testimony about the importance of subjective decision-making when recommending candidates to clients indicates that matchmaking did involve interpreting and implementing Randstad's policies. Although the authority to formulate or deviate from policies may alone be sufficient to trigger the administrative exemption, it is not a *necessary* requirement because the regulations provide examples of employees who qualify for the exemption although they lack any apparent authority to formulate or deviate from policies. *See, e.g.*, *id.* § 541.203(b) ("Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products."); § 541.203(e) ("'[W]hen interviewing and screening functions are performed by the human resources manager or personnel manager who makes the hiring decision or makes recommendations for hiring from the pool of qualified applicants, such duties constitute exempt work . . . ."); § 541.203(f) ("Purchasing agents with authority to bind the company on significant purchases generally meet the duties requirements for the administrative exemption . . . ."). Finally, although Plaintiffs exercised less discretion than the Staffing Managers described in the 2005 WHD Letter, (*see* Op. of Moore, J., at 36–37), they exercised significantly more discretion than the personnel clerks described in 29 C.F.R. § 541.203(e).

matchmaking responsibilities as Account Managers, but generally with less independence and more supervision. As Perry testified, Staffing Consultants had at least some discretion to decide which tasks to do when. Instead of writing her own job descriptions, however, Perry used Randstad's in-house resources and was required to follow rigid procedures so as to produce a job description that tracked Randstad's required format. Similarly, Perry was required to post all her vacancies via Randstad's internal system, which routed them to predetermined external web sites, and it was only if that process failed to produce qualified candidates that she had discretion to recruit independently. And while admittedly not dispositive for the reasons discussed, there is no evidence that Perry had the authority to unilaterally fire an arranged worker.

Further, Perry testified that her most important duty as a Staffing Consultant was "selling Randstad services," not matching candidates to clients. (R. 67-6, PID 1520.) To that end, she spent time reaching out to both existing and prospective clients. This involved sending out marketing materials according to Randstad policies, making phone calls on a schedule set by the company, and knocking on doors in specific areas and on specific streets assigned by branch management. Perry was free to use her own network and initiative to identify new prospects, but even then, those prospects had to fit criteria set by Randstad. Dooling gave similar testimony about her sales duties during her time as a Staffing Consultant.

It appears that most of a Staffing Consultant's sales responsibilities involved little more than "use of skill in applying well-established techniques, procedures or specific standards" prescribed by Randstad. 29 C.F.R. § 541.202(e). As related to sales, the record evidence does not establish that Staffing Consultants had "authority to formulate, affect, interpret, or implement management policies or operating practices," and, accepting Plaintiffs' testimony as true, Staffing Consultants had little or no ability to "waive or deviate from established policies and procedures without prior approval." *Id*. § 541.202(b). Nor is there evidence they "carrie[d] out major assignments" or "perform[ed] work that affect[ed] business operations to a substantial degree." *Id.* Considering "all the facts involved"—and appearing in the record—Staffing Consultants' sales activities were non-exempt. *See id*.

Judge Sutton's partial dissent argues that Plaintiffs' sales duties fall within the administrative exemption because Plaintiffs "exercised considerable discretion in marketing

Randstad's services within their assigned territories." (Op. of Sutton, J., at 38.) The partial dissent relies on two out-of-circuit cases, *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560 (7th Cir. 2012) and *Smith v. Johnson & Johnson*, 593 F.3d 280 (3d Cir. 2010), both involving pharmaceutical sales representatives. The cases, however, are distinguishable because the plaintiffs in *Schaefer-LaRose* and *Smith* had far more independence than Perry and Dooling had as Staffing Consultants.

In *Smith*, the Third Circuit found that the administrative employee exemption applied to a traveling pharmaceutical sales representative who used a high level of planning and foresight to develop a strategic sales plan, and who performed her duties independently without direct oversight, running "her own territory as she saw fit." 593 F.3d at 285. Smith testified in her deposition: "It was really up to me to run the territory the way I wanted to. And it was not a micromanaged type of job. I had pretty much the ability to work it the way I wanted to work it." *Id.* at 282–83.

In *Schaefer-LaRose*, the Seventh Circuit concluded that the pharmaceutical sales representatives at issue exercised independent judgment and discretion because the employer

> trained them extensively in disease processes, [the employer's] own assigned products, and products manufactured by competitors; indeed they were tested in their substantive knowledge. The level of attention given to substantive education demonstrates that the company viewed these individuals as employees needing a solid understanding of the message that they were delivering if they were to fulfill their roles as the company's representative to the community of practicing physicians. A significant amount of discretion is no doubt required to determine when the physician's inquiry is sufficiently nuanced to require a response from a more knowledgeable individual than the representative himself. The representative who is unable to tailor the conversation to the time and circumstances, or to engage the physician in an intelligent conversation, is understandably not an effective representative to the professional community whose estimation of the company is key to its success.

679 F.3d at 581. In fact, the plaintiff in *Schaefer-LaRose* "described herself as a 'scientist,' rather than a salesperson, because she was charged with 'convey[ing] scientific information to physicians about how and why [the employer's] product is beneficial to patients.'" *Id.* at 568 n.16 (citation to record omitted). Moreover, before visiting a particular physician, a sales representative would develop "a pre-call plan," which could include reviewing the physician's

prescribing practices, patient population, and similar information, to develop a strategy for a conversation with the physician that would induce the physician to prescribe the employer's pharmaceutical products. *Id.* at 563–64.

Here, however, Plaintiffs' discretion as Staffing Consultants was much more circumscribed; in contrast to the representatives in *Schaefer-LaRose* and *Smith*, Perry and Dooling fulfilled their sales duties by merely following Randstad's well-established techniques and procedures to meet the pre-determined quotas. The record is clear that Plaintiffs were able to "run their territor[ies]" only as Randstad saw fit and did not have the authority to independently "develop a strategic plan" to effectuate their duties. For instance, although Perry sometimes knocked on prospective clients' doors on her own initiative, she was also required to participate in door-knocking "blitzes," for which Randstad assigned her (and her colleagues) to specific ZIP codes and streets. (R. 67-6, PID 1522.) Further, Perry was required to make follow-up calls to prospective clients on the schedule prescribed by Randstad, and she could not choose to deviate from Randstad's commands in any meaningful way. Moreover, unlike the representatives in *Schaefer-LaRose*, Plaintiffs' task was merely to sell Randstad's staffing services, not to "convey scientific information" while navigating "federal law and . . . medical ethics requirements" in a "tightly regulated industry." 679 F.3d at 562–63, 568 n.16 (alteration removed from first quotation).

Turning to the question of the Staffing Consultants' primary duties, Dooling testified that her non-exempt sales duties took up "50 percent of [her] time." (R. 67-2, PID 1462.) She spent the rest of her time on a mix of exempt and non-exempt recruiting and matchmaking duties. Based on the estimates of time spent on various tasks Perry offered during her deposition, she spent at least five hours per day on sales activities, perhaps more. The record is silent as to how much time Dooling or Perry spent on exempt matchmaking activities as opposed to non-exempt routine recruiting duties. Thus, as with Account Managers, we must draw the reasonable inference that Staffing Consultants spent less than half their time on exempt tasks. *See Schaefer*, 358 F.3d at 400–01. This is significant because factors other than time do not compel the conclusion that a Staffing Consultant's "primary duty" was "the performance of exempt work." 29 C.F.R. § 541.202(a)-(b). As discussed above, Staffing Consultants had relatively little

freedom from direct supervision, and Randstad makes no attempt to advance its case based on "the relationship between [a Staffing Consultant]'s salary and the wages paid to other employees," such as Talent Acquisition Specialists, "for the kind of nonexempt work performed by [Staffing Consultants]." *Id.* § 541.202(a).

For those reasons, a reasonable trier of fact could find that Perry's and Dooling's primary duties during their time as Staffing Consultants were their non-exempt sales and routine recruiting tasks, not their exempt matchmaking duties. *See Schaefer*, 358 F.3d at 405–06 ("To the extent that [defendant] does point to some tasks that undisputedly require the exercise of discretion, [defendant] has failed to establish the extent to which [plaintiff] completes these tasks as part of his primary duty and thus fails to meet its burden."). The district court thus erred in granting summary judgment to Randstad as to Dooling's and Perry's time as Staffing Consultants based on the administrative exemption.[9]

### d. Assistant Branch Manager

When asked at oral argument whether any Randstad employees *were* covered by the administrative exemption, Plaintiffs' counsel acknowledged that employees who managed a branch office were covered, and stated that Plaintiffs were "not pressing" the assertion that Assistant Branch Managers fell outside the exemption. (Oral Arg. at 2:08.) We take that as a concession that Lane was covered by the administrative exemption during her time as an Assistant Branch Manager, from February 2013 to July 2014. And, to the extent counsel may not have intended to concede this point, we have no trouble concluding that Lane's responsibilities as an Assistant Branch Manager—which included supervising everyone other than the branch manager, counseling Randstad's internal employees, participating in performance reviews, dealing with problems her subordinates could not resolve, and at least some exempt matchmaking duties, consisted primarily of exempt work.

---

[9]We express no opinion on whether any other exemptions apply, as Randstad has not raised any other exemptions on appeal.

## C. The Good-Faith Reliance Defense

Since Randstad is not entitled to summary judgment regarding Lane's time as a Talent Acquisition Specialist, Dooling's time as a Staffing Consultant, or Perry's time as a Staffing Consultant and Senior Staffing Consultant, we turn to the applicability of the statutory good-faith reliance defense.

The Portal-to-Portal Act of 1947 "protect[s] employers from liability if they took certain actions on the basis of an interpretation of the law by a government agency, even if the agency's interpretation later turned out to be wrong." *Equal Emp't Opportunity Comm'n v. Home Ins. Co.*, 672 F.2d 252, 263 (2d Cir. 1982); *see Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673, 679 n.3 (6th Cir. 2000). The statute provides that:

> no employer shall be subject to any liability or punishment for . . . failure of the employer to pay minimum wages or overtime compensation under the [FLSA] . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the Administrator of the WHD] . . . with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

29 U.S.C. § 259(a), (b)(1); *see also* 29 C.F.R. §§ 790.13-790.19 (defining key terms and giving illustrative examples). Thus, the statute "provide[s] an affirmative defense to employers" who comply with its terms and the "accompanying regulations." *Fazekas*, 204 F.3d at 679 n.3. The district court found the defense applicable here. We disagree.

### 1. "In Conformity With" and "Good Faith"

The operative administrative interpretation here is the 2005 WHD Letter.[10] The 2005 WHD Letter is a qualifying written ruling by the Administrator. *See id.*; 29 C.F.R. § 790.17(d). Further, Plaintiffs do not dispute that Randstad actually relied on the 2005 WHD Letter. The

---

[10]The 2005 WHD Letter was relevant to our *retrospective* analysis of whether Plaintiffs were covered by the administrative exemption. *See Fazekas*, 204 F.3d at 677–79. Whether Randstad can make out a valid defense based on its *prospective* reliance on the 2005 WHD letter is a separate question.

only open questions, then, are whether Randstad acted "in conformity with" the 2005 WHD Letter and in "good faith."

The DOL has published regulations interpreting those two statutory terms.  29 C.F.R. §§ 790.14 ("in conformity with"), 790.15 ("good faith").  We have never directly addressed the matter, however.  The closest we have come is *Marshall v. Baptist Hospital, Inc.*, 668 F.2d 234 (6th Cir. 1981).  In that case, we held that the employer hospital was protected by the good-faith reliance defense because it reasonably relied on the portion of the WHD's then-current Field Operations Handbook that specifically stated student x-ray technicians were not "employees" for purposes of the FLSA, rather than another, more general section, that stated medical training programs would be evaluated on a case-by-case basis.  *Id.* at 237–39.[11]  However, the instant case does not involve conflicting guidance from the WHD, and *Marshall* does not speak directly to the meanings of "in conformity with" and "in good faith."  Further, "[i]n the years following *Marshall*, [we have] had little additional opportunity to construe . . . § 259(a)."  *See Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 833 (S.D. Ohio 1999)).

Other courts, however, have considered both 29 U.S.C. § 259(a) and 29 C.F.R. §§ 790.14-15, and concluded that the "in conformity with" and "good faith" requirements are related, but distinct.  *See, e.g.*, *Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 926 (11th Cir. 1987).  As to good faith, one well-reasoned opinion from within our circuit explained:

> The good faith requirement contains both subjective and objective components. The subjective component requires an employer to show that it had "honesty of intention and no knowledge of circumstances which ought to put him upon inquiry."  However, subjective good faith is not enough—the employer must also satisfy an objective test. In other words, "good faith is not to be determined merely from the actual state of [the employer's] mind."  The employer must show that it "acted as a reasonably prudent man would have acted under the same or similar circumstances."

*Swigart v. Fifth Third Bank*, 870 F. Supp. 2d 500, 510 (S.D. Ohio 2012) (quoting 29 C.F.R. § 790.15(a); other citation omitted) (alteration in *Swigart*).  Succinctly put, "[g]ood faith requires

---

[11]The handbook has since been revised, and now states that all paramedical training programs, including those for x-ray technicians, should be evaluated on a case-by-case basis.  U.S. Dep't of Labor, Wage & Hour Div., *Field Operations Handbook* §§ 10b11, 10b14, https://www.dol.gov/whd/FOH/FOH_Ch10.pdf.

that the employer have . . . no knowledge of circumstances which ought to put him upon inquiry." 29 C.F.R. § 790.15(a) (internal quotation marks and citations omitted).

As to conformity, "[a]n employer cannot avail itself of the defense unless it relied on a DOL interpretation that specifically addresses its circumstances." *Swigart*, 870 F. Supp. 2d. at 512 (citing *Frank v. McQuigg*, 950 F.2d 590, 597–98 (9th Cir. 1991)). "In other words, '[t]he administrative interpretation relied upon must provide a clear answer to the particular situation in order for the employer to rely on it.'" *Id.* (quoting *Cole*, 824 F.2d at 928 (alteration in *Swigart*); *see Bollinger v. Residential Capital, LLC*, 863 F. Supp. 2d 1041, 1050–51 (W.D. Wash. 2012) (collecting cases); *Schneider*, 102 F. Supp. 2d at 833 (same). Finally, "[i]f there is no conformity, general good faith in other respects cannot save the day." *Swigart*, F. Supp. 2d at 512 (quoting *Home Ins. Co.*, 672 F.2d at 265).

## 2. Analysis

The parties focus their arguments on whether or to what extent Plaintiffs' duties matched those described in the 2005 WHD Letter. In doing so, they conflate two separate questions. First, were the two sets of duties so similar that the 2005 WHD Letter "provide[d] a clear answer to the particular situation" faced by Randstad when it decided how to classify Plaintiffs (conformity)? *Cole*, 824 F.2d at 928. Second, did Randstad act reasonably, or did it have "knowledge of circumstances" that should have prompted further inquiry before relying on the 2005 WHD Letter (good faith)? 29 C.F.R. § 790.15(a). Asking the proper questions reveals that the district court erred.

Randstad's reliance on the 2005 WHD Letter is shown through five letters from its attorney, Alexander Passantino, all written between May 28 and July 16, 2010. Each letter addresses the FLSA status of one group of Randstad employees: Staffing Consultants; Staffing Managers; Account Managers; Senior Account Managers; and Assistant Branch Managers. And each letter cites the 2005 WHD Letter in support of the conclusion that the employees in question are covered by the administrative exemption. Further, James Ferguson, Randstad's in-house counsel, attested that he relied on the letters and the authorities cited therein, including the 2005 WHD Letter, in classifying Randstad's employees.

Randstad's reliance was not "in conformity with" the 2005 WHD Letter because certain "specified circumstances and facts" cited in the 2005 WHD Letter are absent, at least as to Talent Acquisition Specialists and Staffing Consultants/Senior Staffing Consultants. *See* 29 C.F.R. § 790.14(b). For example, the employees covered by the 2005 WHD Letter had "*full authority* to discipline, fire, promote and assign to various tasks the employees they supervise[d]." 2005 WHD Letter at *1 (emphasis added). In Randstad's Troy office, Talent Acquisition Specialists and Staffing Consultants/Senior Staffing Consultants were involved in those decisions, and Staffing Consultants/Senior Staffing Consultants actively counseled underperforming employees, but they did not have the ultimate authority to decide to fire an employee. Also, the employees covered by the 2005 WHD Letter "work[ed] under very little supervision" and acted "without prior approval." 2005 WHD Letter at *1. That was not the case for Talent Acquisition Specialists and Staffing Consultants/Senior Staffing Consultants. Thus, the 2005 WHD Letter did not provide "a clear answer to the particular situation" faced by Randstad in deciding how to classify its Talent Acquisition Specialists and Staffing Consultants/Senior Staffing Consultants. *See Cole*, 824 F.2d at 928; *Bollinger*, 863 F. Supp. 2d at 1052 ("partial overlap in duties" does not satisfy the "clear answer" requirement).

Additionally, Randstad has not shown its reliance was in "good faith" as a matter of law because Randstad arguably had "knowledge of circumstances which ought to" have caused it to inquire further. *See* 29 C.F.R. § 790.15(a). A recurring theme in Passantino's letters is that some Randstad employees will spend more time on sales activities than others, and that sales activities are typically not covered by the administrative exemption. Randstad also knew that its employees' job duties "could vary significantly based on the clients serviced," "the market," "who the branch manager is," and "who the area vice president is for that particular region." (R. 55-6, PID 761.) For example, in the Troy office, mandatory participation in "contests" sometimes required Plaintiffs to perform tasks outside of their usual responsibilities. Despite all this, Randstad classified its employees on a nationwide basis. At minimum, then, there is a factual question whether Randstad reasonably relied on the 2005 WHD Letter to classify Plaintiffs as FLSA-exempt without conducting a review of their individual duties, or at least a review of the duties of employees in the Troy, Michigan office or the relevant region. *Swigart*, 870 F. Supp. 2d at 511 (good-faith defense not proven as a matter of law in part because "there is

no evidence that Defendant made an attempt to communicate with its [employees] or their supervisors to determine the [employees'] primary job duties or whether they were actually performing the same job duties as the mortgage loan officers described in the [relevant WHD] Opinion Letter").

## IV. CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to Randstad as to: (1) Dooling's claim arising out of her time as an Account Manager; (2) Lane's claims arising out of her time as an Account Manager and Senior Account Manager; and (3) Lane's claim arising out of her time an Assistant Branch Manager. We **REVERSE** the district court's grant of summary judgment as to: (1) Lane's claim arising out of her time as a Talent Acquisition Specialist; (2) Dooling's claim arising out of her time as a Staffing Consultant; and (3) Perry's claims arising out of her time as a Staffing Consultant and a Senior Staffing Consultant.[12]

---

[12]We note that the district court did not address Randstad's statute of limitations arguments below, and Randstad made no statute of limitations arguments on appeal. We therefore express no opinion on the issue.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I agree with the court that Plaintiffs' sales duties fall outside of the administrative exemption, but I disagree that their matchmaking duties fall within the exemption.

To fall within the administrative exemption, an employee's primary duties must "include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). "The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). Mindful that exemptions to the Fair Labor Standards Act "are to be narrowly construed against the employers seeking to assert them," *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *see also Auer v. Robbins*, 519 U.S. 452, 462 (1997), this court must consider several "[f]actors . . . when determining whether an employee exercises discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.202(b). "Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required." 69 Fed. Reg. 22122, 22143 (Apr. 23, 2004). The three factors most relevant to Plaintiffs' duties at Randstad, and most likely to bring their matchmaking duties within the administrative exemption, are "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; "whether the employee has authority to waive or deviate from established policies and procedures without prior approval"; and "whether the employee provides consultation or expert advice to management." 29 C.F.R. § 541.202(b). Analyzing these three factors, I conclude that Plaintiffs' matchmaking duties do not fall within the administrative exemption.

First, none of the Plaintiffs in this case had the authority to "formulate" or even "interpret" or "implement" Randstad's policies. *Id.* Randstad constrained employees' discretion by establishing a points system requiring them to complete certain tasks to earn 100 points per week. R. 67-6 (Perry Dep. at 270) (Page ID #1550). Randstad further constrained employees'

schedules by holding "contests" that required them to perform specific tasks at specific times. *Id.* 271 (Page ID #1550); R. 67-7 (Lane Dep. at 92) (Page ID #1571).  This rigid points system meant that Plaintiffs performed company-assigned matchmaking tasks each week, rather than deciding on their own how to find candidates and place them in appropriate jobs.

Beyond lacking authority to decide which tasks would help them achieve Randstad's matchmaking goals, or flexibility as to when to perform their assigned tasks, Plaintiffs also lacked discretion over how to perform their assigned tasks.  Randstad had specific requirements for job descriptions, and an outline that employees had to follow when interviewing candidates. R. 67-6 (Perry Dep. at 129, 144–45) (Page ID #1531, 1535); R. 67-2 (Dooling Dep. at 117–18) (Page ID #1473–74).  When screening candidates, Plaintiffs selected which candidates to interview based on preset criteria, rather than their own assessment of whether the candidate was a good fit for a particular position.  R. 67-2 (Dooling Dep. at 132–33) (Page ID #1476); *but see* R. 67-6 (Perry Dep. at 143, 152) (Page ID #1535–36) (explaining that she exercised some judgment in deciding who to bring in for an interview, although the decisions were based on predetermined criteria).  Randstad also established a precise timeline for checking on new hires to see how they were doing at their placements.  R. 67-6 (Perry Dep. at 158–59) (Page ID #1538); R. 67-7 (Lane Dep. at 149) (Page ID #1576).  Plaintiffs did not interpret or implement, let alone formulate, Randstad policies; they followed specific rules that they did not help create.

Second, Plaintiffs did not have the authority to deviate from established policies without prior approval.  For example, Randstad had a standard billing rate of 60%.  R. 67-6 (Perry Dep. at 119) (Page ID #1529).  Plaintiffs could not agree to charge under 60% without prior approval from their supervisors.  Explaining the process of setting the billing rate, Perry made clear that the rate "wasn't up to [her]."  *Id.* at 122 (Page ID #1530).  Plaintiffs did not have the authority to deviate from other Randstad policies, either.

Third, with one exception, Plaintiffs did not provide advice to management.  Randstad gave Plaintiffs formulas for how to advertise job openings, interview candidates, set a client's billing rate, and follow up after making a placement.  Plaintiffs did not give management advice or suggestions about these formulas, but simply followed them.  The exception is Lane's time as an Assistant Branch Manager; in that capacity, Lane could "make recommendations regarding

the hiring and firing of employees at [her] branch" that would be "very well considered." R. 67-7 (Lane Dep. at 74) (Page ID #1567). But even when Lane was an Assistant Branch Manager, she did not have full authority to hire and fire. And as an Assistant Branch Manager, Lane still lacked discretion over decisions like the billing rate, and was still subject to the 100-point system that told her how to allocate her time. *Id.* at 82, 110 (Page ID #1569, 1575). Plaintiffs largely did not advise management, and none of them had any input about the policies, formulas, or procedures they were required to follow. Considering these three factors as well as the other enumerated factors that determine whether an employee exercises discretion and independent judgment, *see* 29 C.F.R. § 541.202(b), I conclude that Plaintiffs' matchmaking duties fall outside the administrative exemption.

The Department of Labor's Wage and Hour Division (WHD) letter about Staffing Managers further convinces me that Plaintiffs' matchmaking duties do not fall within the administrative exemption. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2005 WL 3308616, at *1 (Oct. 25, 2005) [hereinafter WHD Letter]. In concluding that certain Staffing Mangers fall within the administrative exemption, the WHD Letter notes that the Staffing Managers discussed in the letter "work under very little supervision" and "make decisions and accomplish their tasks without prior approval." *Id.* By contrast, Plaintiffs worked within a 100-point system that told them which tasks to perform in a given week, from the number of phone calls to make to the number of candidates to place in jobs. R. 67-6 (Perry Dep. at 66) (Page ID #1518).

The Staffing Managers discussed in the letter "continue[d] to supervise the services of the employee" "[o]nce the employee [was] placed" with a client, and they had "full authority to discipline, fire, promote and assign to various tasks the employees they supervise." WHD Letter at *1. Here, however, although Plaintiffs communicated with companies and employees after making a placement, they did not supervise the employees. They were intermediaries between companies and new employees, rather than supervisors. R. 67-6 (Perry Dep. at 160–61) (Page ID #1538).

The Staffing Managers discussed in the letter "decide[d] if advertising for the position is needed to find certain candidates" and "negotiate[d] the costs of such placement." WHD Letter

at *1.  Here, however, Plaintiffs advertised for jobs at predetermined websites that they accessed through Randstad's portal.  R. 67-6 (Perry Dep. at 132–34) (Page ID #1532–33).

Moreover, the letter specifically distinguishes Staffing Managers from "nonexempt . . . personnel clerks who simply screen applicants to obtain data regarding qualifications and to identify those who do not meet the minimum required standards."  WHD Letter at *3 (citing 29 C.F.R. § 541.203(e)).  This description of personnel clerks is much closer to the duties of Plaintiffs than the description of Staffing Managers.

The majority acknowledges the differences between the Staffing Managers discussed in the WHD Letter and Plaintiffs' positions, and even says that the differences are significant enough that Randstad could not have relied in good faith on the WHD Letter.  In my view, the differences are so significant that the WHD Letter makes clear that Plaintiffs' matchmaking duties fall outside of the administrative exemption.

Therefore, I disagree with the court that Plaintiffs' matchmaking duties fall within the FLSA's administrative exemption.  I would reverse the district court's judgment.  Therefore, as to the part of this court's judgment affirming the district court's grant of summary judgment, I respectfully dissent.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I agree with the court that the plaintiffs' match-making duties fall within the administrative exemption, but I cannot agree that their sales duties do not.

The plaintiffs' own testimony demonstrates that they exercised considerable discretion in marketing Randstad's services within their assigned territories. Perry testified that, as a staffing consultant, she had to identify prospective new customers, classify those prospects as top or secondary priorities, and select networking events to attend. Perry also selected prospective clients to take out to meals, approximately "three times a month." R. 67-6 at 14. When marketing to existing clients, Perry would show them the resumes of job candidates she thought might have "potential for a client" based on her knowledge of that client's needs. *Id.* at 10. The objective of all this on-your-own sales activity was to generate 1.5 new clients, and to check in with 6 existing clients, each month. Dooling provided fewer details about her sales duties, but her description of the job parallels Perry's.

On these facts, the staffing consultants' sales duties "include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Case law shows as much. In *Smith v. Johnson & Johnson*, the Third Circuit held that a pharmaceutical sales representative fell within the administrative exemption. 593 F.3d 280, 285 (3d Cir. 2010). Johnson & Johnson gave Smith a "target list" of doctors in her assigned territory and required her to complete ten visits per day. *Id.* at 282. The list also identified "high-priority" doctors, and Smith could choose to visit these doctors more often than the others. She received a budget for those visits, which she could use to take doctors to lunch or to put on seminars. *Id.* Because Smith decided for herself how to woo those high-priority customers, the Third Circuit determined that Smith's position required her to use discretion and independent judgment to "form a strategic plan designed to maximize sales in her territory." *Id.* at 285.

The Seventh Circuit followed suit in *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560 (7th Cir. 2012). The pharmaceutical sales representatives in that case received "specific call plans identifying the physicians to be visited and the degree of frequency or priority category for each physician," but nonetheless applied "strategic analysis to their work, choosing to see physicians not on their call plans or non-physicians who may influence prescribing patterns." *Id.* at 581; *see also Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 13–14 (1st Cir. 1997) (holding that insurance marketing representatives exercised discretion and independent judgment).

With respect, I am not persuaded by the court's attempt to distinguish these cases. The court points to the *nature* of the commodities being sold rather than *how* employees convinced clients to buy them. Randstad's employees, the court says, sold talent, not complex prescription drugs in a highly regulated environment. But which way does that cut? For the pharmaceutical sales representative, there may be a correct (if complicated) answer to how a drug dissipates in the body after a subcutaneous injection. But for Randstad's employees, there often will *not* be a scientific answer to whether a particular candidate meets a client's "intangible" staffing needs or is a good fit for that company's "culture." Answering the former question requires flash cards; answering the latter requires judgment.

The court suggests, alternatively, that Randstad's employees exercised less discretion because they were subject to greater supervision. If anything, the staffing consultants in this case exercised *more* discretion because they identified and prioritized prospective clients on their own, while the pharmaceutical representatives received prioritized lists of doctors from their employers. For that reason, Randstad's staffing consultants would still be exempt even under the one opinion coming to a contrary conclusion on pharmaceutical sales representatives. *See In re Novartis Wage & Hour Litig.*, 611 F.3d 141, 157 (2d Cir. 2010), *abrogated on other grounds by Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012).

That the staffing consultants considered criteria and followed timetables set by Randstad does not eliminate discretion from this work. Most employers set business objectives and direct employees to perform certain tasks as part of a job. But that says nothing about *how* an employee goes about achieving those objectives or performing those tasks. The plaintiffs considered Randstad's criteria and followed its scheduling requirements when matching job

candidates with clients, but that does not make those actions any less discretionary. The staffing consultants made strategic sales decisions on their own, without interference from their managers, even if those managers sometimes told them how to divide their time between sales and recruiting.

It's also true that the staffing consultants performed a number of non-discretionary tasks as part of their sales duties, such as making cold calls, writing personal notes, and knocking on businesses' doors. But all administrative positions include some required legwork. The pharmaceutical representatives spent substantial time driving and filling out paperwork, *see Smith*, 593 F.3d at 283, but they qualified for the administrative exemption because that more menial work served the "strategic [sales] plan" they developed using their independent judgment, *id.* at 285. So too here.

For these reasons, I respectfully concur in part and dissent in part.